**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

25 My RentCo LLC, *et al.*,

Debtors.

**NOT FOR PUBLICATION**

Case No. 25-12280 (MG)

(Jointly Administered)

Tribeca Space Managers,

Plaintiff,

v.

Tribeca Mews Ltd., Brad Thurman,
as Executor of the Estate of Harold Thurman,
Brad Thurman, 25 My RentCo LLC,

Defendants.

Adv. Pro. Case No. 25-01143 (MG)

# MEMORANDUM OPINION AND ORDER RESOLVING ALL ISSUES FOLLOWING TRIAL AND DETERMINING AMOUNT OF ALLOWED CLAIM

***A P P E A R A N C E S***

**RIVKIN RADLER LLP**
*Attorneys for Plaintiff*
477 Madison Avenue, Suite 410
New York, New York 10022
By: Kenneth Murphy, Esq.
Jeremy Honig, Esq.
Evan Schieber, Esq.
Aaron Zerykier, Esq.

**MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP**
*Attorneys for Defendants Tribeca Mews Ltd., Brad Thurman as Executor of the Estate of Harold Thurman, Brad Thurman, and 25 MyRentco LLC*
190 Willis Avenue
Mineola, New York 11501
By: Thomas J. McGowan, Esq.

and

**BRAUNSTEIN TURKISH LLP**
*Attorneys for Defendants Tribeca Mews Ltd., Brad Thurman Executor of the Estate of Harold Thurman, Brad Thurman, and 25 MyRentco LLC*
7600 Jericho Turnpike, Suite 402
Woodbury, New York 11797
By: William J. Turkish, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are issues that have been tried arising from a complaint originally filed in New York Supreme Court (the "State Court") on January 20, 2022 (the "Amended Complaint," ECF[1] Doc. # 1) by Tribeca Space Managers (the "Board" or "Plaintiff") and removed to this Court due to the bankruptcy filing by debtors Tribeca Mews Ltd ("Tribeca Mews") and 25 My RentCo LLC ("RentCo") (collectively with Tribeca Mews, the "Debtors"). There are five causes of action asserted in the Amended Complaint against the Debtors, Brad Thurman ("Brad"), and Brad Thurman as the Executor of the Estate of Harold Thurman (the "Estate") (collectively, the "Defendants"):

- The first cause of action for breach of contract is asserted against Sponsor[2] and seeks damages for the Sponsor's alleged failure to construct the building in accordance with the offering plan and various plans filed with the Department of Buildings (the "Filed Drawing") and in accordance with the New York City Building Code (the "Building Code"). The Sponsor has denied the claim and has asserted various affirmative defenses thereto.

[1] All references to "ECF" will refer to "Adv. Pro. Case No. 25-01143" unless otherwise noted.
[2] Both Debtors have been at times been designated Sponsor. The timing of such is discussed *infra*.

- The second cause of action asserts an alleged breach of fiduciary duty claim against Brad Thurman relating to his actions or inaction as one of the Sponsor's designees on the Board of Managers of the Building from 2008 to 2012. Brad Thurman has denied the claim and has asserted that New York law requires the dismissal of this claim as a matter of law.
- The third cause of action asserts an actual fraudulent conveyance claim against the Sponsor, Brad Thurman and the Estate.
- The fourth cause of action asserts constructive fraudulent conveyance against the Sponsor, Brad Thurman and the Estate.
- The fifth cause of action asserts successor sponsor liability against RentCo.

(ECF Doc. # 1, Ex. A, the "Amended Complaint" ¶¶72-123.)

A trial (the "Trial") was held from June 22, 2026 to July 1, 2026.

## I. INTRODUCTION

Plaintiff brings this action against Defendants to recover for alleged breaches of contract, fiduciary duty, and fraudulent conveyances related to Defendants association with 25 Murray Street, New York, NY ("25 Murray" or the "Building"). The issues tried at trial were stipulated in a joint pre-trial order (the "PTO," ECF Doc. # 34). Those issues are the following: (1) whether Plaintiff is able to establish through a preponderance of the evidence that the Sponsor is liable for breach of contract including whether the breach of contract claims are barred under the terms of the offering plan and applicable law; (2) whether the Plaintiff is able to establish through a preponderance of the evidence that Brad owed a fiduciary duty to the Board as one of the designees of the Sponsor and whether he breached a fiduciary duty to the Board; and (3) whether the Plaintiff is able to establish through a preponderance of the evidence that the Sponsor, Brad and/or the Estate are liable to Plaintiff for actual or constructive fraudulent conveyances. (PTO at 49-50.)

**A. History of the Building and Origins of the Dispute**

The history of the Building traces back to the 1850s, when the original brownstone townhouses that were ultimately combined to create 25 Murray were first built. (6.22 Tr. 126:3-11 (discussing PX 101, an older photo of the Building.) Bounded by Murray, Church, and Warren Streets, the five brownstones sat largely unchanged until the 1990s when they were purchased by Tribeca Mews, owned and operated by Harold Thurman, father to Brad and a prolific developer in and around New York City. (PX 34 (the Deed for 25 Murray Street.)) Tribeca Mews, using plans that were filed with and approved by the New York City Department of Buildings (the "DOB"), planned to combine the five brownstones, gut renovate and add additional stories, and ultimately sell the buildings as condominium units. (*See* PX 14 (the initial Filed Drawings with DOB for work on the Building.)) While the plans were first filed in the late 1990s, the Building faced a number of delays. The September 11 attacks, litigation regarding securing air rights for the additional stories, and changes to the fire code in the wake of the Deutsche Bank fire all forestalled progress. (PTO at 28-29; 6.24 Tr. 234:12-19.)

Eventually, work on construction and conversion was able to finish—the Building consists of the five townhouses combined into one structure, along with five (5) newly constructed floors atop of the old townhomes. The newly converted 25 Murray contained 74 condominium units. (PTO at 6.) Unit sales began in 2007, with unit closings starting in 2008. (6.24 Tr. 236:22-23.) Sales were conducted pursuant to an offering plan (the "Offering Plan," PX 6) which was provided to purchasers. (6.25 Tr. 154:5-155:22.) When residents finally began to move in, they soon noticed problems that have continued to plague the building for the nearly two decades since. Residents reported odors wafting in from other apartments, with smells of "Thanksgiving Fare" coming from neighboring apartments as early as Fall 2008. (PX 36).

Leaks were springing up in various parts of the building due to cracks in the newly installed façade. (6.29 Tr. 41:16-42:16.) There was no permanent occupancy permit ("PCO") for the building, and the many temporary occupancy permits ("TCO") would repeatedly expire before they were renewed. (PTO 6-9.) Issues were raised during Board meetings when Brad sat on the Board and to the Building's management company Thurcon, Inc. ("Thurcon"), which was owned and operated by the Thurmans, yet these issues and others persisted. (6.25 Tr. 167:13-169:16.)

In 2011, the Thurmans incorporated RentCo and transferred 7 unsold units from Tribeca Mews to RentCo for no consideration; RentCo then became successor Sponsor of the Building. (6.25 Tr. 36:14-17; PTO at 18-19.) In 2012, the Board released Thurcon as building manager and hired New Bedford Management Corp. ("New Bedford") in its place. (6.25 Tr. at 191:6-193:16.) Upon taking over, New Bedford drafted a transition report and shared with the Board its findings. New Bedford reported to the non-Sponsor Board members that the Building was subject to several previously unknown DOB violations. (*Id*. at 195:24-199:9.) Soon after learning of these violations, the Board retained Thorton Tomassetti ("TT") to conduct an engineering assessment of the Building (the "2013 TT Report," DX S). (6.25 Tr. 201:17-203:10.) The 2013 TT Report, completed between December 2012 and February 2013, found a number of life safety issues and building defects, including but not limited to parapets of insufficient height, fire stopping issues in the cellar of the Building, various leaks, and deficiencies with the Exterior Insulation and Finish System ("EIFS") that coated the exterior of the building. (DX S at 3.) After receiving the report, the Board soon retained counsel and filed suit against Tribeca Mews, RentCo, Harold Thurman, and Brad Thurman. (6.25 Tr. 203:8-23.)

**B. State Court Proceeding and Further Inquiries in the Building**

On September 23, 2013, the Board commenced *Tribeca Space Managers Inc. v. Tribeca Mews Ltd., et al.,* (Index No. 653292/2013, NY County) (the "State Court Action"). The case was ultimately tried in November 2017 before a mistrial was declared. (Amended Complaint ¶ 121.) Prior to the rescheduled trial date in November 2019, the parties had agreed to a settlement in principle which ultimately fell through. (ECF Doc. # 26.)

After the failure to reach a settlement, TT reported to DOB that issues regarding the kitchen and bathroom exhaust shafts (discussed *infra*) constituted a life safety issue. (DX S at 3.) DOB ultimately determined that it would not continue to issue TCOs for the Building until the exhaust shaft system was remediated. (6.23 Tr. 162:1-163:5.) Upon the final TCO expiring on May 17, 2021, the Plaintiff moved in the State Court Action for court intervention to require Sponsor to obtain an occupancy permit. (ECF Doc. # 47 at 2.) The State Court entered an order to require Defendants to use their "very best efforts" to secure a permit (ECF Doc. 46 Ex. 1), and ultimately the parties entered into a stipulation later so ordered by the State Court (the "So-Ordered Stipulation," PX 45) where Sponsor agreed that it would complete "all work required by the DOB . . . with respect to the remediation of the exhaust shafts at the Building" and would pay such costs. (So-Ordered Stipulation ¶ 2.) Per the So-Ordered Stipulation, the Sponsor would submit plans to remediate the exhaust shaft issues to DOB and soon after begin work. (*Id.* ¶ 4.) Failure to comply with its terms would grant the Board damages, including an award of the Board's attorneys' fees. (*Id.* ¶ 26 ("If the Condominium shall employ counsel to enforce any of Sponsor's obligations under this Agreement, Sponsor shall pay to the Condominium all of its costs and expenses in connection therewith, including, without limitation, reasonable attorney's fees.")) Plans to remediate the exhaust shafts were ultimately filed with DOB by Steven

Kratchman, the architect of record for the Building, and work began on two Sponsor-controlled units in 2024; that work has yet to be completed. (6.22 Tr. 171:22-177:1.)

On October 16, 2025, the Debtors filed separate voluntary petitions under Chapter 11 Subchapter V. (RentCo Voluntary Petition, Case No. 25-12280 ECF Doc. # 1; Tribecca Mews Voluntary Petition, Case No. 25-12281 ECF Doc. # 1.) The filed schedules for RentCo (Case No. 25-12280 ECF Doc. # 3) listed noncontingent claims totaling $1,926.56, while Tribeca Mews schedules (Case No. 25-12281 ECF Doc. # 3) list three noncontingent claims: a plumber is owed $138,075.54, Steven Kratchman is owed $90,375, and legal fees of $47,731.43 are owed to Meltzer, Lippe, Goldstein & Breitstone, LLP. Both schedules list the Board's claim as unknown, contingent, unliquidated, and disputed. The Debtors sought and were granted an Order of Joint Administration, with the RentCo docket becoming the lead case. (ECF Doc. # 14.) Soon after filing, the Debtors removed the State Court Action to this Court pursuant to 28 U.S.C. § 1452(a). (Notice of Removal, ECF Doc. # 1.)

Prior to this trial, the Court sustained the Board's Objection to Debtors Designation to Proceed as Small Business Debtors Under Subchapter V (Case No. 25-12280, ECF Doc. # 82). Neither Tribeca Mews nor RentCo proceed as Subchapter V debtors.

## II. PROCEDURAL HISTORY

The Trial took place from June 22, 2026 to July 1, 2026, with closing arguments heard on September 23, 2026. The following witnesses were heard at from Trial:

- Stephanie Nussbaum, expert witness for the Plaintiff. Ms. Nussbaum is currently the lead architect of the Forensics practice at the TT New York office. She has over twenty years of experience as an architect and has worked on architectural standard of care and building code-related matters. Ms. Nussbaum prepared the *Architectural Investigation of 25 Murray Street* (the "Nussbaum Report," PX 1) and testified to various defects currently afflicting the Building, including but not limited to issues with construction of the exhaust shafts, fire-rated construction, and the façade of the Building.

- Chirstopher Sheridan, expert witness for the Plaintiff. Mr. Sheridan is a Principal and Forensic Mechanical Engineer at TT with over 20 years of experience in HVAC systems. Mr. Sheridan prepared the *Mechanical Exhaust Investigation of 25 Murray Street* (the "Sheridan Report," PX 2) and testified to the defects in the installation of the exhaust system in the Building.

- Margurite Pinto, expert witness for the Plaintiff. Ms. Pinto is a Senior Principal at the TT New York office with more than twenty years of experience as an engineer. Ms. Pinto prepared the *Structural Investigation of Exterior Spaces of 25 Murray Street* (the "Pinto Report," PX 3) and testified to defects related to the construction of the terraces on the seventh and eleventh floors of the Building.

- Rajneesh Sayal, expert witness for the Plaintiff. Mr. Sayal is employed by Dharam Consulting ("Dharam"), a cost estimation firm which conducts approximately one thousand cost estimates per year on both new construction and renovations. (6.29 Tr. 79:21-80:5.) Mr. Sayal himself is a civil engineer who has exclusively worked on cost estimation work for 38 years. (*Id*. 75:24-76:7.) Mr. Sayal oversaw the preparation of the *Expert Report for Litigated Scope of Work at 25 Murray Street* (the "Dharam Report," PX 4) and the attached cost matrix (the "Cost Matrix," PX 5) which details the estimated cost of the Board to complete the projects as contemplated by TT in the Nussbaum Report.

- Kevin Flaherty, witness for the Plaintiff. Mr. Flaherty owns KLA construction ("KLA") , a general contractor who is often hired to oversee construction projects and coordinate trades. (6.25 Tr. 10:1-10.) KLA was hired to create an estimate for how much they would charge to remediate the exhaust system per the TT drawings (PX 49).

- Michael Cohen, witness for the Plaintiff. Mr. Cohen is a resident of the Building and had previously served on the Board, including as President from 2012 to 2019. (6.25 Tr. 153:21-154:4; 163:11-24.)

- Arodis Tomas Castillo, witness for the Plaintiff. Mr. Castillo has been the superintendent of the Building since 2007, living there throughout. He was first hired by Brad Thurman and Thurcon but is currently employed by the Board and New Bedford. (6.29 Tr. 10:3-11:5.)

- Brad Thurman in his individual capacity, witness for the Defendants. As well as being principal of the Sponsor, Brad Thurman served as a member of the Board from 2008 to 2012. (PTO at 17.)

- Steven Kratchman, expert witness for the Defendants. Mr. Kratchman is the Principal and Founder of Steven Kratchman Architect PC ("SKAPC") and a licensed architect in New York. He is the Architect of Record of the Building with DOB and prepared a report responding to the findings and conclusions of the TT employed witnesses (the "Kratchman Report," DX III).

- Herbert Weinstein, expert witness for the Defendants. Mr. Weinstein is the owner of Winston Consultants, Inc, with over forty-five years experience in construction management and project supervision. Mr. Weinstein prepared his expert report (the "Weinstein Report," DX KKK) which provided cost estimates for some of the remediation projects testified to by TT during the 2017 trial.

During Trial, Defendants raised two additional motions: a *Motion to Authorize Withdrawal of Mistaken Admission in Face of Irrefutable and Conclusory Documentary Evidence* (the "Motion to Withdraw," ECF Doc. # 55) and a *Motion to Approve Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(C) and Bankruptcy Rule 7052* (the "Motion for a Directed Verdict," ECF Doc. # 59). This Court has already denied the Motion to Withdraw (*see* ECF Doc. # 65) and while the Court has not ruled on the Motion for a Directed Verdict, per this opinion that motion is now moot.

## III. LEGAL STANDARD

The Board brings three categories of claims against the Defendants: breach of contract against all Defendants, breach of fiduciary duty against Brad Thurman, and fraudulent conveyance against all Defendants.

### A. Breach Of Contract

To prevail on a claim for breach of contract under New York law, a plaintiff must prove "a contract; performance of the contract by one party; breach by the other party; and damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). "To establish the existence of a contract under New York law, a plaintiff must allege an offer, acceptance, consideration, mutual assent, and intent to be bound." *Rozsa v. May Davis Group, Inc.*, 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001) (dismissing a breach of contract claim where the nonmoving party failed to allege facts establishing that the parties mutually agreed to the terms of the contract); *Oscar Prod., Inc. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995) ("[T]he general requisites for

formation of a contract include offer, acceptance, and consideration.") (citing Restatement (Second) of Contracts §§ 24, 50, 71 (A.L.I. 1981)).

The plaintiff "[has] the burden of establishing all essential terms of the alleged contract, with sufficient definiteness that the Court can interpret its terms." *Oscar Prod.*, 893 F. Supp. at 255. The plaintiff "must also establish that there was a meeting of the minds, demonstrating the parties' mutual assent and mutual intent to be bound." *Id.* (citation omitted).

In the condominium context, a sponsor not abiding by the terms of an offering plan can establish a claim for breach of contract. *See, e.g. Gillespie v. St. Regis Residence Club,* 343 F. Supp. 3d 332 (S.D.N.Y. 2018) (determining that the plaintiff fails to allege breach of contract for failure to abide by the terms of an offering plan). Terms of an offering plan limiting sponsor liability for monetary damages are not applicable when a sponsor has failed to effect repairs after having a reasonable opportunity to do so. *430 W. 23rd St. Tenants Corp. v. 23rd Assocs.*, 155 A.D.2d 237, 238 (1989) (Despite the existence of a limited remedy of "repair and replacement" in the offering statement, "we think a failure by the sponsor to effect repairs, after having a reasonable opportunity to do so, should entitle the purchasers to compensation for the reasonable cost of making the repairs or replacements themselves, and nothing more.")

**B. Breach of Fiduciary Duty**

Under New York law, a claim alleging breach of fiduciary duty must set forth three elements: (i) the existence of a fiduciary relationship, (ii) the breach of the fiduciary duty, and (iii) damages resulting from the breach. *SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir. 2004); *In re Grumman Olson Ind., Inc.,* 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) (collecting cases).

Regarding the fiduciary relationship, New York courts have determined that members of condominium boards have fiduciary duties towards unit owners. *See, e.g.*, *Bowery 263 Condominium Inc. v D.N.P. 336 Covenant Ave. LLC*, 169 A.D.3d 541, 542(1st Dep't 2019) (finding that a breach of fiduciary duty can arise against a board member when the member either "participated or directed, controlled, approved, or ratified the decisions" giving rise to the claim) (internal citation omitted); *see also Board of Mgrs. of Fairways at N. Hills Condominium v Fairway at N. Hills*, 193 A.D.2d 322, 324-25(2d Dep't 1993) ("[A] fiduciary duty on the part of the initial board of managers vis-à-vis the condominium and its unit owners came into being at the time of the sale of the first condominium unit.") "The fiduciary duty contemplated here is akin to that enunciated in Business Corporation Law § 717, namely, that the members of an initial board of managers of a condominium must perform their duties 'in good faith and with that degree of care which an ordinary prudent person in a like position would use under similar circumstances'." *Fairway at N. Hills*, 193 A.D.2d at 325 (quoting N.Y. Bus. Corp. Law § 717 (McKinney)).

**C. Fraudulent Conveyance**

The New York Debtor and Creditor Law ("NY DCL") states that a conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration" (now referred to in the statute as "reasonably equivalent value") and when one of the following conditions is met:

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*Sharp International Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005) (quoting N.Y. Debt. & Cred. §§ 272-275). While this has since been amended, these sections remain applicable to this case.

Fair consideration requires both (1) fair equivalency of the consideration and (2) good faith by both parties. *See* NY DCL § 272.

## IV. BREACH OF CONTRACT

The issues underlying the breach of contract claims are fact dependent. The Court provides findings of fact for each of the alleged breaches of contract organized by issue.

### A. Breach of the Offering Plan by Failing to Obtain a PCO

Defendants contest the Board's allegation that the Sponsor was obligated to obtain a PCO within two years after the first condominium unit was sold, claiming that the Offering Plan does not require the Sponsor to do so within this specific time. While the Defendants are correct that the Offering Plan does not specifically state that the PCO is to be acquired within two years, that simple of a reading disregards the more reasonable and practical construction of the Offering Plan. The relevant section of the Offering Plan is as follows:

> If by the date of the first closing only a temporary Certificate of Occupancy for the Building shall have been issued, Sponsor will use its best efforts to cause the Building Department to continuously renew the temporary Certificate of Occupancy until final Certificate of Occupancy covering all Units offered under this Plan shall have been issued. Sponsor is obligated to obtain the final Certificate of Occupancy and will do so prior to the expiration of any temporary Certificate of Occupancy. Sponsor will, at its sole cost and expense, cause to be performed all work and will cause to be supplied all materials necessary to renew the temporary Certificate of Occupancy and Certificate of Compliance for electrical work, boiler inspection, and elevator inspection. At the request of Sponsor, or its designee, the Board of Managers will execute any application or other documents required to be filed with any governmental authority having or asserting jurisdiction in connection with obtaining a final Certificate of Occupancy, at which time Sponsor

> or its designee, as the case may be, shall indemnify and hold the Board of Managers and the Unit Owners harmless from any expense or liability by virtue of the execution of the application or such other documents. Prospective purchasers are advised that a Certificate of Occupancy is required for permanent residential use of the Building and that a temporary Certificate of Occupancy may be used only for a total of two (2) years from the date of its issuance. If the temporary Certificate of Occupancy shall have expired prior to issuance of a permanent Certificate of Occupancy, residential occupancy of the premises will be a violation of the Multiple Dwelling Law, subjecting the occupants to penalties under the Multiple Dwelling Law including the imposition of fines. Additionally Unit Owners may not be able to sell or refinance their Units.

(PTO at 31-32.) The relevant portions of the section as cited by Defendants state that the "Sponsor is obligated to obtain the final Certificate of Occupancy and will do so prior to the expiration of any temporary Certificate of Occupancy." (PTO at 31.) This, Defendants claim, is solely a disclosure to unit purchasers that fines could arise if a PCO is not obtained within two years. Defendants do not address that later in this section the Offering Plan provides that prospective purchasers will be "advised that a permanent Certificate of Occupancy is required for permanent residential use of the Building and that a temporary Certificate of Occupancy may be used only for a total of two (2) years from the date of its issuance." (*Id.* at 32.)

Ignoring the fact that the Sponsor has renewed the TCO 38 times, the Sponsor has allowed it to lapse *24 times* between when it was first acquired in 2008 and today. The Sponsor has failed to renew it since the last TCO expired on May 17, 2021. (*Id.* at 17.) Reading the Offering Plan as a whole, rather than just treating the sentences as separate, as Defendants seem to do, shows that the Sponsor was required to obtain a PCO within the two-year period as claimed by Plaintiff.

Under New York law, a contract is to be read per the "four corners" rule, understanding the contract "as a whole" and "giving a *practical interpretation* to the language employed."

*Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (emphasis added); *see also Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 572 (2002) (when reading a section of a contract "in conjunction with [the accompanying] provision, a reasonable meaning emerges."). As cited to by the Defendants, the Offering Plan "obligate[s]" the Sponsor to obtain the PCO prior to the expiration of any TCO, while also requiring that any potential purchaser of a unit will be advised that a TCO, if used, will only be used for two years after it is first issued. (PTO at 31.)

If read disjunctively, as the Debtors suggest, then one could argue that the Offering Plan only establishes a disclosure requirement and does not impose a contractual duty on the Sponsor. But New York law requires the Court to read the Offering Plan as a whole and to give it a practical interpretation. Practically, the fact that the Sponsor is obligated to obtain the PCO prior to a TCO expiring *and* that purchasers are to be informed that the TCO will be in effect for only two years can only mean that the Offering Plan requires Sponsor to obtain the PCO within two years. Failing to do so, which the Sponsor has, is a breach of the Offering Plan.

The Court **AWARDS** damages to the Plaintiff for the Defendant's breach. Absent a TCO and ultimately a PCO, unit owners are substantially impaired in their ability to sell or refinance their units. Plaintiff did not offer evidence of the damages that unit owners suffered because of their inability to sell or refinance their units. Therefore, the Court awards only nominal damages for the breach—namely, $1,000 per year since 2010, when Sponsor was obligated to obtain a PCO per the Offering Plan, for each unit Sponsor sold. As Sponsor sold 67 of the 74 units in the Building in the intervening 16 years, the Court **AWARDS** $1,072,000.00.

**B. Breach of the Offering Plan due to Construction of the Building**

Per the Offering Plan, the Sponsor has the "duty to construct the Premises in accordance with all applicable codes and filed plans and specifications." (Offering Plan at ii.) Plaintiff

alleges a number of conditions that they believe were not constructed in accordance with applicable codes, the Filed Drawings, or specifications. They will be addressed in turn.

1. Kitchen and Bathroom Exhaust Shafts

The Building is equipped with a kitchen and bathroom exhaust shaft system ("KB Shafts"), the purpose of which is to remove odors and moisture from units. (Nussbaum Report at 7.) Horizontal branch exhaust ducts connect to a total of 25 vertical exhaust duct risers that run up the building to exhaust fans installed on the roof. (*Id.*) This duct system connects to each unit's kitchen and bathrooms, with the fans on the roof designed to pull air, moisture, and smells up and out of the units to the exterior of the Building. (*Id.*) The KB Shafts were built between the walls of units and in mechanical mezzanines located above each unit. While an exhaust system is designed to pull odors and moisture to the system, an improperly designed exhaust system will fail to do so. Exhaust systems can also allow for fires and smoke to spread rapidly from one unit through a building without certain protections. The Building Code mandates fire-resistance rated shaft enclosures throughout a system and fire dampers at vertical and horizontal shaft meeting points to curtail the spread of smoke and fire. (*Id.*)

The Board alleges that the KB Shafts throughout the Building were constructed with numerous defects and in violation of the Filed Drawings and the Building Code. They allege that as the system does not work as intended and were installed in such a manner to constitute a fire safety issue. As soon as tenants began to move into the Building, they reported odors coming from other apartments. (*See* PX 36 (email from tenant Ed Otte complaining of smells of "Thanksgiving fare" coming from another unit.)) Tenants contacted the superintendent, Mr. Castillo, and building manager Thurcon about the issue. (6.29 Tr. 33:18-35:15.) Tests conducted by Mr. Castillo showed the system provided little to no suction as built:

> Mr. Honig: [D]id you inspect the vents in 2007 before any residents moved in?.
> Mr. Castillo: Yes, I did.
> Mr. Honig: And did you do that in every unit in the building?
> Mr. Castillo: Every single unit.
> Mr. Honig: Can you please explain how you inspected those vents?
> Mr. Castillo: So, what we do is make sure we run the [fan] motors upstairs on the roof, and then we go to each apartment, take a piece of tissue, put it against the vent, and if it's holding against the vent, you have suction. If it doesn't, then if the paper falls, there's no suction in the system.
> Mr. Honig: Okay. And what did you find when you inspected the vents and performed that tissue paper test of the vents in this building?
> Mr. Castillo: Nothing. It wasn't doing any suction in any apartment.
> Mr. Honig: So, the tissue paper in each of the apartments—
> Mr. Castillo: Would just fall.
> Mr. Honig: -- would fall to the ground?
> Mr. Castillo: Correct.

(*Id*. 26:17-27:10.)

The Board's expert reports reflect several issues with the KB Shafts that can explain both the failure to properly suction out odor and defects that would only be observed in event of a fire. There were two groups of issues observed: issues related to the enclosures of the KB Shafts and issues with fire dampers installed in the KB Shafts.

*a. Shaft Enclosures*

The Building Code requires that the KB Shaft enclosures must be constructed with at least 2-hour fire rated materials. Building Code §§ 27-344, 27-282, and Table 3-4. The enclosure must be continuous along the shaft, with any gaps filled with 2-hour rated fire proofing sealant. Building Code § 27-345. The Filed Drawings reflected Building Code-compliant designs, showing layers of sheetrock supported on the KB Shaft via steel runners. (Nussbaum Report at 9, Appx. D.1 (including the relevant excerpts of the Filed Drawings.))

Upon inspection of KB Shafts in ten (10) units and the mechanical penthouse of the Building, the Board's experts found the shaft enclosures to be constructed in violation of both the Building Codes and the Filed Drawings. Both the Board's and Defendants' expert reports include images of KB Shafts enclosed with discontinuous sheet rock directly attached to the shafts, often with layers missing or interspersed with plywood. (*See, e.g.*, Nussbaum Report, at 11-12 (Figures 7-13 indicate discontinuous sheetrock attached directly to the KB Shafts via screws, plywood installed within the shaft enclosures, and gaps where no fireproofing material is present); *see also* Kratchman Report at 48-49 (Photos 16-21 showing many of the same issues as the images included in the Nussbaum Report)). This construction is in violation of the Building Code, not in compliance with the Filed Drawings (which showed Building Code complaint construction), and can be linked to the smells that have been plaguing the Building for nearly two decades—the Kratchman Report notes that "[u]nsealed duct systems can result in air leakage of up to 30% of system airflow." (Kratchman Report at 38.)

These issues constitute cause for breach of the Offering Plan.

*b. Fire Damper*

Fire dampers are installed in duct systems to prevent the rapid rise of fire and smoke throughout a building. Typically installed at an open barrier within the duct, the fire damper activates when it detects heat, at which point it closes to restrict the passage of fire and smoke through the system. (Sheridan Report PX 2 at 7.) Building Code Section 27-772, referencing Reference Standard 13-1—Mechanical Ventilation, Air Conditioning, and Refrigeration Systems ("RS13-1 NYCBC") requires that each shaft opening is protected with a fire damper: "Approved fire dampers shall be provided where air ducts penetrate or terminate at openings in walls or partitions. . . ." RS13-1 NYCBC. Effectively, this means that a fire damper is required wherever

a vertical riser duct attaches to a branch duct, as well as when there is a sidewall exhaust grate opening to the apartment.

The Sheridan Report includes images of KB Shafts missing fire dampers at the required locations, including at the points where a branch duct attaches to the vertical riser. (Sheridan Report, Appx. A at 4.) While Defendants and Defendants' expert Mr. Kratchman argue that the horizontal shafts are constructed per the Filed Drawings and are enclosed with a two-hour fireproof "duct jacket" thereby ensuring providing the requisite fire-rated construction (6.30 Tr. 15:13-25), evidence of any such jackets has not been provided to the Court. The reference to the duct jackets by Mr. Kratchman during his in-court testimony was the first time such reference was made—he never made any mention of a "duct jacket" in his lengthy expert report. Images provided by the Schneider Report show horizontal ducts without any such "jacket." Ultimately, Plaintiff has provided ample evidence to show that KB Shafts were not constructed pursuant to the Building Code or Filed Drawings by failing to properly include fire dampers, further evidencing breach of the Offering Plan.

*c. Remediation*

The parties dispute what is necessary to remediate the issues with the KB Shafts and the cost of whatever remediation is required. Plaintiff claims that given the extensive defects throughout the current exhaust system, abandonment-in-place of the KB Shafts and the installation of a new, horizontal shaft system in line with drawings designed by TT and Mr. Kratchman and ultimately filed with DOB by Mr. Kratchman in December 2021 is necessary. (*See* Nussbaum Report at 14.) Defendants, supported by Mr. Kratchman's report and testimony, claim that the best course of action is a 'repair-in-place' program, where the KB Shafts can be repaired "with ease" on a case-by-case basis via firestopping tape and liquids, the same means

first suggested by Mr. Kratchman in 2020. (6.30 Tr. 16:2-19.) Defendants note that TT has not surveyed the entire KB Shaft system, making an abandonment-in-place approach highly inappropriate when probes can be conducted in individual units to determine if the issues prevalent throughout the Building are present in the unit. (*See id*. at 31:8-15.) Kratchman proposes that minor, noninvasive probes can be conducted in all units to determine the extent of repairs necessary, and that all necessary repairs could be completed in "eight or nine weeks" with three crews of contractors. (*Id*. 21:4-18.) Yet this timeline and ease of repairs presumes that the repairs are limited in both number and scope, which Defendants have failed to establish in face of Plaintiff's evidence that the issues with the KB Shafts are endemic throughout the building.

Defendants contest the extent of the issues with the KB Shafts, noting that TT had only conducted intrusive probes in ten (10) units and the mechanical apartment. While that is certainly not the entire building, Ms. Nussbaum testified that she has yet to see a properly constructed KB Shaft and believed TT observed a representative sample of the conditions throughout the entire building: "[J]ust to speak to my due diligence, had I done 10 percent sampling and some of them were a problem and some of them were not, I would ask for a larger sample. However, when you sample 10 percent and everything has the same problem, I'm content, personally, in my own experience, that it is reasonable to stop." (6.23 Tr. 174:11-20.) Defendants and Mr. Kratchman could have presented evidence of properly constructed KB Shafts to show that Ms. Nussbaum was incorrect in believing that it was "reasonable" to assume the problems were widespread, but they do not do so.

Mr. Kratchman during his testimony claimed that Sponsor needed board approval to conduct probes in tenant units as the reason for why Defendants do not provide evidence as to the other units. (6.30 Tr. 199:3-7.) However, no probes of any nature were completed in

Sponsor-owned units in an attempt to prove proper construction. Defendants could have easily conducted these allegedly minimally intrusive probes in the units that they currently control to showcase both the lack of defects and the efficacy of Mr. Kratchman's proposed fix-in-place plan.

In effect, Defendants are arguing that, after 18 years since the first unit closing, as smells have been wafting between apartments for years, where endemic construction defects in violation of the Building Code are holding up a PCO issuance by the DOB, and after entering into the So-Ordered Stipulation acknowledging the problems throughout, repairs should proceed on a unit-by-unit basis because there *might* be units with properly constructed KB Shafts. This not only flies in the face of the evidence currently before the Court, but would further subject unit owners to many more years of delay to ultimately remediate the problems that have and continue to plague the building. And if the work undertaken by the Sponsor in the aftermath of the So-Ordered Stipulation is any indication of the timetable a Building-wide fix-in-place scheme would take—started in 2024 in two (2) units, neither of which have been completed—a piecemeal process as proposed by Defendants and Mr. Kratchman would take many, many years. This leaves tenants without a working exhaust system, an ongoing life safety issue, and keeps DOB from issuing a PCO.

For the reasons explained above, the Court finds that the Plaintiff's abandon-in-place and horizontal shaft remediation plan as the proper plan to determine damages.

*d. Damages*

Defendants contest damages with respect to all breach of contract claims on three grounds: that any recovery is limited the Offering Plan, which states that the Sponsor's sole obligation is to repair and replace defective construction (*Defendants' Post Trial Brief*, ECF

Doc. # 70 (the "Defendants' PTB") at 29); that if compensatory damages are awarded the cost of repairs should be valued at the date of breach, not in 2026 values (*id.* at 32); and if the Court were to determine that damages are to be determined by 2026 valuation, that the Dharam Report is unreliable under *Daubert* and Federal Rule of Evidence 702 (*id.* at 24-28). As discussed below, all three arguments fail with respect to the KB Shafts and the remaining breach of contract claims.

i. The Offering Plan Does Not Limit Plaintiff's Recovery of Monetary Damages

The Offering Plan provides that the "Sponsor's sole obligation hereunder shall be to cause to be repaired or replaced (at Sponsor's option) any defective item or construction (whether arising as a result of defects in material or improper workmanship or material substantially at variance with the plans) . . . ." (*Id*. at 29 (citing Offering Plan at 51.)) Defendants recognize that the court in *430 W. 23rd Street* held that monetary damages can be awarded notwithstanding such a provision but argue that the court required there to be a showing of bad faith. (*Id.* at 30.) Defendants are incorrect in arguing that there needs to be such a showing—the court in *420 W. 23rd Street* was explicit in awarding monetary damages when the sponsor has failed to "effect repairs[] after having a reasonable opportunity to do so . . . ." *430 W. 23rd St.*, 155 A.D.2d at 238; *see also Waverly Props., LLC v. KMG Waverly, LLC*, 824 F. Supp. 2d 547, 558 (S.D.N.Y. 2011) ("The court's decision in *430 West 23rd Street* is based on the well-established principle that a buyer of goods under a contract governed by the Uniform Commercial Code may escape the restrictions of a limitation-on-remedies clause, and, thus pursue other forms of relief, when the agreed remedy fails of its essential purpose.") (internal quotations omitted). Defendants have been on notice for over a decade that these repairs are necessary. With respect to the KB Shafts, unit owners have been complaining about smells since

2008. When required by the State Court to repair the KB Shafts per the So-Ordered Stipulation, Sponsor failed to complete the work in the units that they started in two years ago, let alone the remaining 72 units in the Building.

The Sponsor has had an opportunity to effectuate repairs and has clearly failed to do so. Plaintiff's recovery is not limited by the "repair and replace" language of the Offering Plan.

ii. Plaintiffs are Entitled to Compensatory Damages Calculated in 2026 Dollars

Defendants argue that under *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256 (1998), this Court is bound to calculate the value of compensatory damages as of the date Sponsor breached the Offering Plan, not in 2026 dollars. In *Brushton-Moira*, the plaintiff retained defendant-architect to complete renovations on plaintiff's building, with the defendant recommending a certain brand of window panels. *Bruston-Moira*, 91 N.Y.2d at 259. The panels were installed and a certificate of occupancy was issued for the building, but soon after the panels began to bow and deteriorate. *Id.* Plaintiff sued for compensatory damages for the windows, and the trial court ultimately awarded damages representing costs of replacement as of the trial date. *Id*. at 260. The Court of Appeals reversed the damage award determining that:

> Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed. . . . Thus, damages for breach of contract are ordinarily ascertained as of the date of the breach. In accordance with these guideposts, we have held that a cause of action for defective design or construction accrues upon the actual completion of the work. . . . In the instant case, the parties agree that the cause of action accrued on April 9, 1982, when the work was completed and a certificate of occupancy was issued.

*Id.* at 261-262.

This Court is not limited by the holding in *Brushton-Moira*. Sponsor has ongoing duties to unit owners to remedy defects over time and, as has been discussed above, the Building is lacking *both* a TCO and PCO. This is unlike the architect in *Bruston-Moira* who entered into a contract limited to the completion of the project with no continuing obligation and was able to complete the work to secure a certificate of occupancy. If a condominium or co-op board plaintiff is only able to recover monetary damages after affording sponsor a "reasonable opportunity" to "effect repairs" under New York law, then it cannot also be that a board plaintiff's recovery is limited to values of whenever the sponsor was first in breach. *See 430 W. 23rd St.*, 155 A.D.2d at 238 ("[F]ailure by the sponsor to effect repairs, after having a reasonable opportunity to do so, should entitle the purchasers to compensation for the reasonable cost of making the repairs or replacements themselves, and nothing more."); *see also Waverly Props.*, 824 F.Supp.23 558 (same).

To the extent that damages are awarded to Plaintiff for breach of the Offering Plan, the costs to remediate the breach will be present value.

iii. The Court Finds the Dharam Report Reliable

At Trial, Mr. Sayal described the means by which Dharam conducts all cost estimations, including the estimates completed for the Board. Dharam utilizes an internal database (the "Database") that contains information on thousands of projects and is consistently updated with vendor pricing and information from industry publications (Dharam Report at 2), as well as the RS Means online database to determine how many work hours are required (*id.* at 2-3). Mr. Sayal oversaw the completion of the Cost Matrix appended to his expert report.

As noted in the Dharam Report, Dharam has acted as a cost estimator for numerous projects within the tri-state area and Massachusetts, estimating multi-million dollar projects

estimated within three (3) percent of the ultimate bid amount. (Dharam Report at 3.) For this project, Mr. Sayal and his team utilized the designs and scope of work analysis as supplied by TT, figures compiled by the Database, and calculations that take into account contingencies, general conditions, profit, and additional fees to create the Cost Matrix. (*Id*. 4, 6.) The Database information used by Mr. Sayal and his team were not provided to either the Court or Defendants, though Defendants did not seek the information nor sought to depose Mr. Sayal prior to Trial.

Defendants object to the use of the Dharam Report and Mr. Sayal's testimony on reliability grounds. They argue that Dharam Report and Cost Matrix are insufficiently supported by facts and data and must therefore be excluded under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and Rule 702. (Defendants' PTB at 24-25.) Pursuant to Rule 702, to be admissible expert testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 318 (S.D.N.Y. 2009), *aff'd,* 976 F.3d 239 (2d Cir. 2020). In assessing reliability under both Rule 702 and *Daubert*, courts are to consider "(1) whether the testimony is grounded on sufficient facts, (2) whether the underlying methodology is reliable, and (3) whether the witness has applied the method reliably to the facts." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

Defendants claim that the numbers used by Mr. Sayal come from an "unreliable database" that warrants exclusion and cite to *Wantanabe Realty Corp. v. City of New York*, 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004), *aff'd,* 159 F. App'x 235 (2d Cir. 2005) for the proposition that "unpublished price quotations or estimates done for litigation, as was this one, do not contain [] guarantees of reliability." (Defendants' PTB at 25.) Defendants argue that the use of a "proprietary database" does not make the underlying data reliable and reasonable to use

for the Cost Matrix as it is not grounded on sufficient facts and proper methodology. (Defendants' PTB at 25-27.) Despite Defendants' claims, courts have regularly accepted testimony offered by cost estimators when utilizing regular methods to estimate costs. *See e.g.*, *Providence Piers, LLC v. SMM New England, Inc.*, 2015 WL 9699936, at *8 (D.R.I. Oct. 1, 2015), *report and recommendation adopted*, 2016 WL 126742 (D.R.I. Jan. 11, 2016) ("[C]ourts overwhelmingly hold that estimating the cost of a complex repair requires the forecasting of the amount, type and costs of materials and labor, which are not common knowledge or familiar in everyday life; accordingly, predicting future repair costs requires specialized knowledge and is expert, not lay, testimony."); *Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096477, at *2 (S.D. Fla. Dec. 22, 2011) ("Experts routinely rely on the work of others, a practice permitted by Fed. R. Evid. 703, s*o long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field*." (emphasis added)).

As noted in the Dharam Report, Dharam's database is updated and checked by staff whose sole role is to continually update Dharam's data for labor and material costs. (Dharam Report at 2.) The Database is additionally checked against "industry published cost database[s] such as RS Means and market report[s] such as ENR (Engineering News Record)." (*Id.*) It is undisputed that the use of RS Means is industry standard. *See, e.g.*, *In re WorldCom, Inc.*, 2009 WL 2959287, at *6 (Bankr. S.D.N.Y. Aug. 18, 2009) ("The RSMeans Manual is published by the R.S. Means Company and provides cost information used by the construction industry for estimating construction costs.").

While Dharam relied on a Database not provided to the Court or to opposing counsel to come to the estimates reflected in the Cost Matrix, it is not beyond the bounds of *Daubert* and Rule 703 for this Court to rely on Mr. Sayal's testimony: it is common in the field of cost

estimation to base estimates on internal database figures. In *Board of Managers of 195 Hudson St. Condo. v. 195 Hudson St. Assocs., LLC*, 63 A.D.3d 523 (2009), the court sanctioned the use of an internal database by a licensed cost estimator: "this witness's education, training and experience qualified him to testify as an expert in connection with estimating costs. . . ." *Id.* at 524. New York courts have not required cost estimators to rely solely on documents in evidence for their testimony to be admitted and found reliable. *Mary Imogene Bassett Hosp. v. Cannon Design, Inc.*, 127 A.D.3d 1377, 1381 (2015) ("Contrary to defendant's assertion that the cost estimator lacked a proper foundation for his opinion because he relied on a document that was not in evidence, he was directly involved in the estimation process and prepared the document from which he extracted the figures that he testified to . . . . Thus, the cost estimator's testimony was based on information commonly relied upon in the profession or within his personal knowledge."); *see also Bd. of Managers of 195 Hudson St.*, 623 A.D.3d at 524; *730 Equity Corp. v. New York State Urb. Dev. Corp.,* 2014 WL 2134562 (N.Y. Sup. Ct. 2014), *aff'd*, 142 A.D.3d 1087, 37 N.Y.S.3d 599 (2016) (another example of a court accepting cost estimator testimony).

In addition to support from caselaw to relying on testimony similar to that to the Dharam Report, the cases cited to by Defendants can be distinguished from the facts in this case. Dharam's and Mr. Sayal's experience is distinguishable from the expert in *Wantanabe Realty.* At issue in that case was the cost estimation for construction of a roller coaster. The court determined that the cost estimate was inadmissible, highlighting that the background of the alleged expert was not in cost estimation:

> Mr. Battaglia has a B.S. in business with a marketing emphasis. For a number of years, he worked for The Disney Company, first as a ride operator and then in supervisory capacities and in the marketing department at Disneyland. Later, he joined a three-person project development team that assessed the relative success of different rides at Disneyland in preparation for the development of Disney

> World in Florida. After leaving Disney, Mr. Battaglia joined Ringling Bros. Barnum & Bailey Circus as a vice president of planning where he did similar work.
>
> Eventually, Mr. Battaglia and another started the firm with which he now is associated, Battaglia Incorporated, which develops theme parks and entertainment complexes and resorts for clients on a turnkey basis, developing a concept, participating in design, doing feasibility analyses and preparing architectural and engineering drawings. While it does not actually build, it sometimes oversees general contractors on behalf of owners. It is involved also in developing revenue estimates in order to evaluate proposed capital investments and in making initial estimates of the costs of constructing proposed amusement rides.
>
> It is far from clear that Mr. Battaglia's background, even given the liberality of the standards for qualification, qualified him to testify concerning these matters

*Wanatabe Realty*, 2004 WL 188088 at *1-2. It cannot be said that Dharam and Mr. Sayal's background is questionable for testifying on cost estimation. Dharam undertakes approximately a thousand cost estimation projects annually and Mr. Sayal has been providing cost estimates for more than 38 years for large companies and public authorities in New York and the surrounding area. (Dharam Report at 1-2.) The selected projects provided in the Dharam Report show that not only do Mr. Sayal and Dharam have extensive experience with cost estimation, but that their estimates have been *good*, with differences being no more than 2.36% between the estimated total and the ultimate bid. (Dharam Report at 3.) It is notable, given the Defendants' issues with Mr. Sayal's estimates including markups in the damage estimates for the Building (*see, e.g.*, 6.30 Tr. 122:04-19), that the prior cost estimates provided in the Dharam Report show estimates that were both higher and lower than the ultimate bid, further providing credence that the estimates in the Dharam Report are methodologically proper and accurate.

The damages estimate made by Mr. Sayal and Dharam is further supported by the testimony of Mr. Flaherty and a budget estimate completed by KLA. TT hired KLA, a licensed

general contractor in New York often hired to oversee construction projects similar to the ones required on the Building, to budget the costs of repairing the KB Shafts in line with the abandon-in-place plan and Filed Drawings filed with DOB in December 2021. (6.25 Tr. 10:1-20:1.) During his testimony, Mr. Flaherty noted that he received budgets from all required subcontractors to complete the work (*id.* at 22:20-22) and that the overhead and profit percentages included are the typical figures used by KLA (*id.* at 25:12-14). KLA completed its estimate without knowledge of this ongoing litigation or of the Dharam Report.

KLA budgeted in December 2025 that abandon-in-place and replacement of the KB Shafts with the horizontal system would cost $9,664,118.56. (PX 49 at 3.) The Dharam Report, of which Defendants argue is unreliable because of the use of the Database, determined that the total cost of the same project would be $10,225,359.41, approximately six percent higher than KLA. (Cost Matrix at 1.) Of note, the total reflected in the Cost Matrix includes assumptions that costs will increase over time—the Dharam estimate notes that the $10 million figure is the estimated cost borne by the Board as of 2028 when the project is completed. (*Id.*) The KLA estimate additionally does not include contingency or architectural and engineering fees, fees that are not borne by the general contractor but are part of the costs that must be considered and anticipated by the party paying for the project. This was conceded by Defendants' damages expert Mr. Weinstein. (7/1/26 Tr. 25:19-26:6). Mr. Sayal and Dharam anticipated the *total* cost of the project to be borne by the owner, making their estimate all the more reasonable. The KLA budget indicates that Mr. Sayal and Dharam properly applied cost-estimator methodology reliably to the facts as required by Rule 702.

The Board has demonstrated that the testimony of Mr. Sayal and the Dharam Report can be properly relied on by this Court. Of note for the Court in making its final determination,

Defendants' expert Mr. Weinstein failed to provide any estimate for the repairs of the KB Shafts, either a repair-in-place model suggested by Mr. Kratchman or the horizontal duct model per the Filed Drawings.

As such, with respect to the KB Shafts the Court finds that the Defendants breached the Offering Plan, that the correct remediation is the abandonment in place of the current KB Shafts and the construction horizontal duct system drawings that are currently on file with DOB, and that the damages owed to the Board shall be however much it will cost to complete the project — $10,225,359.41 as estimated by Dharam.

2. Fire Rated Construction Issues

Plaintiff is seeking damages for alleged improper fire-rated construction in the walls and ceilings of the Building as observed by TT. According to Ms. Nussbaum, the Filed Drawings conformed with the Building Code, which requires 2-hour fire resistance rated partitions between "mercantile, business and residential occupancies and at fire separations between the corridor and apartment units," and a 3-hour fire rated resistance partition between buildings. (Nussbaum Report at 20.) The Building Code additionally requires firestopping materials such as fire-resistant caulk to fill in gaps to stop the transfer of fire or smoke. (*Plaintiff's Post Trial Proposed Findings of Fact and Conclusions of Law*, ECF Doc. # 68 (the "Plaintiff's Proposed Findings") at 12.) The experts for both parties are in agreement that these fire stopping requirements of the city cannot be mitigated with sprinklers, as is the case with the floors (*see infra*-Section IV.B.3). (6.30 Tr. 214:25-215:12.) Ms. Nussbaum testified to a number of instances where she observed issues related to fire-rated construction, including:

- Horizontal and vertical fire divisions and fire separations with only one layer of sheetrock installed where two layers were specified by the Filed Drawings and required for a 2-hour fire resistance as required by the Building Code;

- Non-continuous fire separations observed resulting in vertical and horizonal fire divisions missing 2-hour fire resistance as designed by the Filed Drawings and the Building Code;

- Multiple open and unsealed holes and gaps in fire-resistance construction that are supposed to be filled to stop the transfer of fire or smoke;

- The wall separating the cellar corridor and the laundry room is constructed of non-rated glass storefront rather than the code-required 2-hour fire resistance partition;

- For the walls which separate the Building and the adjacent building (125 Church Street), TT observed that the vertical fire divisions between buildings had open, unsealed holes and that the Sheetrock of the fire-rated walls did not extend to the fire-resistance rated floor above. The Code requires a continuous vertical 3-hour fire-resistance rated fire division wall between The Building and 125 Church Street.

(Nussbaum Report at 20-21.) Because of these issues, Ms. Nussbaum claims that all non-compliant fire-resistant rated construction must be removed and replaced to be Building Code complaint. This process entails:

- The removal and reconstruction of deficient ceilings;

- The reconstruction of fire-rated walls where the current construction does not extend to the underside of an adjoining fire-resistance rated floor or ceiling;

- The addition of firestopping in void spaces that have been observed;

- The addition of firestopping materials in all penetrations through fire-resistance rated construction on all floors;

- The construction of a new 2 hour fire-resistance rated storefront wall in the laundry room; and

- The construction of a new 3-hour fire-resistance rated wall, ceiling, door, and frame for the vestibule between the Building and 125 Church Street.

(Nussbaum Report at 23.) The cost to remediate the issues noted in the Nussbaum Report was estimated by Dharam and included in the Cost Matrix.

Defendants do not appear to contest that the observed issues with the Building are present. Defendants and their expert Mr. Kratchman contest the repairs necessary to remediate the vestibule between the Building and 125 Church Street. During his testimony, Mr. Kratchman

claimed that his report contained an alternative means of remediating the issue for only "$25,000." (6.30 Tr. 217:3-219:21.)

However, the Kratchman Report does not include any discussion on the fire division between the Building and 125 Church Street and how he believes that remediating the vestibule will cost only $25,000. As a result, the Court does not credit Mr. Kratchman's comments regarding an alternative means of remediating the issue; the Defendants have not provided sufficient evidence to show that Mr. Kratchman's plan as stated during his testimony would both sufficiently remediate the issue and how much such remediation would cost.

Therefore, the Court finds that the Defendants breached the Offering Plan by failing to construct the requisite fire-rated divisions as observed by TT and noted in the Nussbaum Report. Per the Dharam Report and Cost Matrix, the Court **AWARDS** $1,513,860.06.

3. Use of Combustible Materials in the Flooring

Plaintiff seeks damages based on the alleged use of combustible plywood in the floor construction of floors six through ten, contending that the construction deviated from both the Offering Plan and the Building Code. (Plaintiff's Proposed Findings at 13-14.)

The Offering Plan provides that "[t]he floors from the 6th floor to the Roof are on non-combustible framing of steel columns and girders with steel joists covered with a cementitious floor and gypsum wallboard ceilings." (Offering Plan at 95; *Defendants' Proposed Findings of Fact and Conclusions of Law*, ECF Doc. # 69 (the "Defendants' Proposed Findings") at 11; Defendants' PTB at 14.) Likewise, the original Filed Drawings depict the floor construction from the sixth floor through the roof as a non-combustible two-hour rated floor assembly. (Defendants' Proposed Findings at 11; Defendants' PTB at 14.) At the time the Building was

constructed, the Code required floors six through ten to be constructed with a cementitious subfloor over steel joists. (Plaintiff's Proposed Findings at 13.)

During construction, DOB approved revisions to the Code that permitted floors one through six to be built as combustible construction, while floors seven through ten still must have been constructed with non-combustible materials. (Defendants' Proposed Findings at 11; Defendants' PTB at 14.) Kratchman testified that the revised plans reflected the one-hour rated assembly for the sixth floor and were specifically identified on the approved AI-1 Form. *(Id.)*

TT performed destructive probes on floors six through ten to determine the composition of the floor assemblies. (Plaintiff's Proposed Findings at 13.) Ms. Nussbaum observed that the sixth floor consisted of plywood installed directly over the steel joists without Viroc, a cementitious fireproof board. (*Id.*) On floors seven through ten, she observed Viroc installed over the steel joists with plywood placed above the Viroc but beneath the finished flooring. (*Id.*)

Ms. Nussbaum acknowledged that, following the DOB's revision of the Code, the sixth floor construction is no longer a violation of the Building Code. (*Id.*) Nevertheless, Nussbaum testified that the absence of Viroc on the sixth floor remained inconsistent with the construction described in the Offering Plan. (*Id.* at 13-14.) Plaintiff therefore maintains that, although the sixth floor is code compliant, it violates the Offering Plan. (*Id.*)

The parties also dispute whether the construction of floors seven through ten complies with the Code. (Plaintiff's Proposed Findings at 14; Defendants' Proposed Findings 12.) Ms. Nussbaum testified that the plywood installed above the Viroc violated former Building Code section 27-351 because combustible material was not permitted unless one of the enumerated exceptions applied. (Plaintiff's Proposed Findings at 14.) According to Ms. Nussbaum, none of those exceptions were present because the plywood was not fire-retardant, was not cemented to

the finished flooring, and did not qualify as an acoustic or insulating board. (*Id.*) She further testified that the relevant Code provision contains no reference to a finished floor "assembly," rejecting Defendants' interpretation that combustible plywood could be incorporated into the assembly. (*Id.*)

Mr. Kratchman disagreed with Ms. Nussbaum's interpretation of the Code. (Defendants' Proposed Findings at 12; Defendants' PTB at 14-15.) Although both experts agreed that Building Code section 27-351 governs the disputed construction, Mr. Kratchman testified that combustible plywood is permitted as part of the finished floor assembly. (Plaintiff's Proposed Findings at 14; Defendants' Proposed Findings at 12.) He explained that the plywood on floors seven through ten is installed above the Viroc cementitious board, which remains part of the Building's two-hour rated floor assembly. (Defendants' Proposed Findings at 12; Defendants' PTB at 14.) Mr. Kratchman further testified that plywood is commonly used as a subfloor and stated that the construction of floors seven through ten complies with both the Building Code and the Offering Plan. (Defendants' Proposed Findings at 12; Defendants' PTB at 15.)

The record also contains testimony regarding the Building's fire protection systems. (*Id.*) Ms. Nussbaum acknowledged that the Building's sprinkler system mitigates fire-protection concerns associated with the floor construction. (Defendants' PTB at 15.) She further testified that, in her experience, similar conditions are often not remediated because the cost of replacing the floor assemblies is substantial. (*Id.*)

Plaintiff seeks damages for the replacement of the disputed floor construction, contending that the combustible plywood used on the sixth through tenth floors fails to comply with the Offering Plan and, with respect to floors seven through ten, the Code. (Plaintiff's Proposed Findings at 13-15.) Defendants contend that the sixth floor is code compliant following the

DOB-approved revisions, that the seventh through tenth floors comply with the applicable Code because the plywood is installed above the Viroc cementitious board within the rated floor assembly, and that the Building's sprinkler system further mitigates any fire-protection concerns. (Defendants' Proposed Findings at 11-12; Defendants' PTB at 14-15.)

*a. Sixth Floor*

Plaintiff contends that although the sixth floor no longer violates the Building Code, the absence of Viroc nevertheless constitutes a breach of the Offering Plan because the floor was not constructed using the materials originally specified. (*Id.*) Even assuming, without deciding, that the sixth floor construction deviates from the Offering Plan, Plaintiff has failed to establish that it has been damaged and that that replacement of the sixth floor assembly is necessary.

Under New York law, damages for breach of contract are intended to place the non-breaching party "in as good a position as it would have been had the contract been performed," not to provide a windfall. *Brushton-Moira*, 91 N.Y.2d at 261. While the ordinary measure of damages in construction cases is the reasonable cost of repairing the alleged defect, New York courts have long recognized that replacement costs are not appropriate where they are disproportionate to the benefit obtained. *See Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 244-45 (1921) (declining to award the cost of replacement where completion would require substantial reconstruction that was "grossly and unfairly out of proportion to the good to be attained").

Here, Plaintiff has not demonstrated that replacement of the sixth floor assembly is reasonably necessary. Plaintiff's own expert acknowledged that, because the DOB changed its application of the applicable Code provisions after the Building was constructed, the sixth floor construction is no longer a violation of the Building Code. (Plaintiff's Proposed Findings at 13.)

Plaintiff offered no evidence that the DOB presently requires the sixth floor assembly to be replaced or that the existing construction otherwise fails to comply with the applicable Code. (Plaintiff's Proposed Findings at 13; Defendants' Proposed Findings at 11.)

Plaintiff's damages theory rests entirely on the assertion that the sixth floor construction differs from that described in the Offering Plan. (Plaintiff's Proposed Findings at 13-14.) While that alleged deviation may be relevant to whether Defendants complied with the Offering Plan, it does not establish that wholesale replacement of the sixth floor assembly is the proper measure of damages. See *Jacob & Youngs*, 230 N.Y. at 244-45 (limiting replacement-cost damages where the cost of reconstruction was disproportionate to the benefit obtained).

Moreover, Plaintiff has not demonstrated that the existing sixth floor construction causes any present injury requiring remediation. Plaintiff identifies no current Building Code violation, no DOB directive requiring replacement, and no evidence that the existing floor assembly poses a present safety concern necessitating reconstruction. Although Mr. Kratchman agreed that a Viroc floor provides a fire-rating benefit when compared to a wood floor, (Plaintiff's Proposed Findings at 13), that testimony does not establish that replacement of an otherwise code-compliant floor is reasonably necessary or that the extraordinary replacement costs Plaintiff seeks represent the proper measure of damages.

Accordingly, even assuming that the sixth floor construction deviated from the Offering Plan, Plaintiff has failed to meet its burden of proving that replacement of the sixth floor assembly is the appropriate measure of damages. Because the record establishes that the sixth floor construction is presently code compliant, and Plaintiff has not demonstrated that replacement is reasonably necessary to remedy any existing defect, the Court will not award damages for this breach of the Offering Plan.

*b. Seventh to Tenth Floor*

Plaintiff seeks to recover the cost of replacing the floor assemblies on floors seven through ten, contending that the installation of combustible plywood above the Viroc cementitious board violates former Building Code section 27-351 and, therefore, the Offering Plan. (Plaintiff's Proposed Findings at 14.) According to Plaintiff, combustible plywood is not permitted because none of the exceptions set forth in section 27-351 apply. (*Id.*) Defendants disagree, maintaining that the plywood forms part of the finished floor assembly and is installed above the Viroc cementitious board, which remains part of the Building's two-hour rated floor assembly. (Defendants' Proposed Findings at 12; Defendants' PTB at 14-15.) The Court need not resolve that dispute because, even assuming Plaintiff's interpretation of section 27-351 is correct, replacement of the floors is unnecessary.

As discussed above, the purpose of contract damages is to place the non-breaching party "in as good a position as it would have been had the contract been performed," not to provide a windfall. *Brushton-Moira*, 91 N.Y.2d at 261. In construction cases, the ordinary measure of damages is the reasonable cost of repairing the alleged defect. *Id.* at 262. Nevertheless, replacement-cost damages are not appropriate where the requested reconstruction is disproportionate to the benefit obtained. *See Jacob & Youngs*, 230 N.Y. at 244-45.

The evidence presented at Trial does not establish that replacement of the floor assemblies on floors seven through ten is reasonably necessary. Although Ms. Nussbaum testified that the plywood violates section 27-351, she also acknowledged that the Viroc cementitious board remains installed beneath the plywood flooring on each of those floors. (Plaintiff's Proposed Findings at 14.) Likewise, Mr. Kratchman testified that the Viroc remains part of the Building's two-hour rated floor assembly and that the plywood is installed above the

Viroc as part of the finished floor assembly. (Defendants' Proposed Findings at 12; Defendants' PTB at 15.) Thus, regardless of whether the plywood complies with section 27-351, the record reflects that the cementitious Viroc layer remains part of the existing floor construction. (Plaintiff's Proposed Findings at 14; Defendants' Proposed Findings at 12.)

More importantly, Plaintiff's own evidence does not establish that replacement of the existing floor assemblies is necessary to address any present fire-safety concern. Ms. Nussbaum acknowledged that the Building is protected by a sprinkler system that mitigates the fire-protection concerns associated with the disputed floor construction. (Defendants' Proposed Findings at 12; Defendants' PTB at 15.) She further testified that, in her experience, "usually . . . most buildings don't fix those things because they're very expensive." (*Id.*) Those admissions are difficult to reconcile with Plaintiff's request for replacement of every floor assembly from the seventh through the tenth floor.

Nor does the record establish that replacement is otherwise required. Plaintiff presented no evidence that the DOB has directed Defendants to replace the floor assemblies or that the existing construction presents a present condition requiring remediation notwithstanding the existing Viroc and sprinkler protection. Instead, Plaintiff seeks replacement costs because, in its view, the current construction does not comply with section 27-351 or the Offering Plan. (Plaintiff's Proposed Findings at 14-15.) Even assuming Plaintiff is correct, that alone is not sufficient to require the displacement of residents to rip up the upper floors of the Building that are not a safety risk given the presence of the sprinkler system.

Accordingly, the record does not establish that replacement of the floor assemblies is reasonably necessary to remedy the alleged defect. Plaintiff therefore has not met its burden of

establishing entitlement to the replacement cost damages it seeks and the Court **DENIES** the requested damages for the floor assemblies.

4. Accessibility

Plaintiff alleges that portions of the Building were not built in compliance with accessibility requirements as affirmed in the Offering Plan. The Offering Plan states that "[t]he building complies with the requirements of Local Law 58/87. The building is handicapped accessible, and handicapped adaptable dwelling units are provided." (Offering Plan at 92). Local Law 58/87 amended the Building Code via adding Reference Standard RS 4-6, which in turn incorporated ANSI A117.1-1986, the American National Standard for accessibility in buildings. Appended to Ms. Nussbaum's report, the standards include requirements for accessible routes, corridor clearances, ramp requirements, areas of refuge, and handrails. (Plaintiff's Proposed Findings at 15 (citing Nussbaum Report at Appx. C.22-C.39).)

Defendants concede to nearly all accessibility issues in the Building raised by Plaintiff (Defendants' Proposed Findings at 12), but they do contest two of Plaintiff's claims. Defendants claim that the stairwells have adequate areas of refuge and that current Building Code requirements related to the width of dead-end corridors do not apply to the Building due to grandfathering, and even if the requirements did apply, the corridors are wide enough. (*Id*).

As for the stairwell issue, the Defendants contend that the measurements collected by TT were incorrect and that the stairs were designed to be oversized on landings to provide enough room for an area of refuge. (6.29 Tr. 256:3-8.) The applicable section of ANSI as cited by the Nussbaum Report, ASNI 4.3.10, does not give a defined requirement for refuge, stating solely that the accessible routes such as the stairwells in question "shall . . . connect to an accessible place of refuge. Such accessible . . . places of refuge shall comply with the requirements

established by the administrative authority having jurisdiction." ANSI A117.1-1986 4.3.10. In New York, an area of refuge "shall provide *clear public space* . . . adequate in size to hold the occupant load it receives from the floor area it serves. . . ." Building Code § 27-372 (emphasis added). The oversized stairwells, even if they do have "just enough [room] for one wheelchair," (6.30 Tr. 227:9-10) are evidently *not* a clear public space. Mr. Kratchman testified that he only realized that the area could possibly fit *a single wheelchair* after spending much time thinking it over. (*Id.* at 227:5-13 ("He put the 6-foot dimension on the stair from the first riser to the back wall, and I've never seen that before."). If Mr. Kratchman, a licensed architect who often deals with designing areas of refuge, only determined that the landing could be an area of refuge after spending much time thinking it over, it is unlikely that someone requiring an area of refuge in an emergency would realize that they may fit on the stair landing. This does not even get into the issue that room for a single wheelchair is almost certainly not adequately sized to hold occupant loads from floors with multiple apartments. The Court finds that the stairwells do not provide adequate refuge.

With respect to the dead-end corridors, the Nussbaum Report contains images indicating that the corridors at issue are only 34-1/8 inches wide, narrower than the 36 inches required by the Building Code. (Nussbaum Report, Appx. A.5 Photo 49; ANSI A117.1-1986 4.3.3.) Mr. Kratchman testified on cross examination that the ASNI was applicable to the Building. (6/30/26 Tr. 225:25). As for the measurements, while Mr. Kratchman claimed that the TT measurements were incorrect, Mr. Kratchman himself did not measure the corridors:

> The Court: Did you measure to be able to say that their measurements were incorrect?
> Mr. Kratchman: No. I just looked at how they measured, how they said they measured. And then—
> The Court: Has anybody else measured that bolster your testimony that their measurements are incorrect?

Mr. Kratchman: No.

(6.29 Tr. 257:8-14.) Absent any other measurements, the Court finds that the corridors do not meet Building Code requirements.

As Plaintiff has sufficiently argued that the alleged accessibility issues are in violation of the Building Code and therefore in breach of the Offering Plan, the Court **AWARDS** damages of $771,175.01 per the Cost Matrix. (Cost Matrix at 1.)

5. Ceiling Heights

The Plaintiff alleges that the Sponsor failed to ensure that ceiling heights in certain portions of the Building were built in accordance with the Building Code. (Plaintiff's Proposed Findings at 16.) The Building Code requires that residential occupancy J-2, interior stairs must have a minimum headroom clearance of 6 feet 8 inches. Building Code § 27-375(c). Ceilings in habitable rooms must have a minimum ceiling height of eight (8) feet. *Id.* § 27-751. Corridors must have a minimum ceiling height of seven feet six inches; however, a ceiling height below seven feet is permitted for no more than twenty-five percent of the corridor area. *Id.* § 27-369(b).

Plaintiff alleges that the Building falls short of the Building Code's requirements in various instances. Ms. Nussbaum observed that the ceilings in the "Recreation Room" were below six feet eight inches in many locations. (Nussbaum Report at 31.) Ms. Nussbaum also observed that the corridors on floors two through five contained ceiling heights below the seven feet six-inch requirement for fifty-eight percent of the square footage, in violation of the Building Code's requirement that the maximum permissible variance is twenty-five percent. (*Id.*) Ms. Nussbaum also observed numerous locations throughout Fire Stairs A and B and the mezzanine stairs of the Building where the ceiling height was less than six feet eight inches. (*Id.*

at 32.) The Defendants have not responded to the Plaintiff's allegations on this point or provided evidence to contravene the Plaintiff's assertions.

With respect to remediation and damages, Ms. Nussbaum concludes that to remediate the non-compliant ceiling heights, the Board will need to remove and replace existing structural beams. demolish and replace the non-complaint ceiling in the Recreation Room, and the corridor ceilings must be demolished and reinstalled at the appropriate height. (*Id*.) The Dharam Report values the cost of this remediation at $523,616.22. (Cost Matrix at 6.) The Plaintiff has not provided their own cost estimate of the repairs or otherwise disputed the Plaintiff's valuation for the remediation of the non-compliant ceiling heights.

Accordingly, the Court **GRANTS** the Plaintiff's request for $523,616.22 to remediate the ceiling heights and bring them into compliance with the Building Code.

6. Combustible Material in Non-Combustible Walls

The Building Code requires that the exterior walls of the Building—both the combustible portion and the noncombustible portion of the building—must be built with non-combustible materials. Building Code §§ 27-282; 27-374. As described in the Nussbaum Report, TT observed combustible materials, mainly wood (some dating back to the 1850s from when the brownstones were first built) in the exterior walls of the Building. (Nussbaum Report at 33-34, Appx. A.6 (photos 67-72 showing the old roofing wood and voids).) This wood was often observed around the window shims in units. (*Id*. at Appx. A.6 (photos 65-66 are examples of plywood windows shims.)) Defendants do not contest the extent of the issues alleged or the required remediation. Defendants do not provide a cost estimate to remediate observed wood in the exterior walls; the Court agrees with the $136,913.67 estimated figure as provided by

Dharam to remediate the issue as observed in units 6A, 6B, 6C, 6E, 6F, and 6J and **AWARDS** this amount in damages. (Cost Matrix at 6.)

Defendants do contest the cost of remediation to repair and replace the wooden window shims. Mr. Weinstein in his report calculated that to the entire process to replace the wooden shims on the windows with new shims would cost $847 per window, totaling $155,001 for the 183 windows on floors six through ten. (Weinstein Report, Ex. B.) The Dharam Report and Cost Matrix indicate that Dharam estimated the cost to replace the shims between floors six through ten to be $628,055.03. (Cost Matrix at 7.) Unlike the Dharam Report and Cost Matrix which used an internal database to estimate costs, Mr. Weinstein used his "basic knowledge of what costs are over a 40-year plus" career along with speaking to contractors. (7.1 Tr. 79:1-41.) For instance, Mr. Weinstein's estimate that it would take a carpenter half a day to replace a window shim and a painter thirty minutes to repaint the area came solely from his own opinion and was not cross-checked with any industry standard source. (*Id.* at 100:13-101:11.) As indicated by Mr. Weinstein's testimony, it appears that he is estimating for the most efficient work, not how long or extensive the work will actually be. For instance, Mr. Weinstein estimated that a painter would be able to complete their work in thirty minutes since the painter would only have to paint the newly installed frame but acknowledged during his in-court testimony that to paint "a specific window in an existing condition," you "probably" need to paint the whole wall or potentially the entire room to match. (*Id*. at 101:15-102:4.) The Cost Matrix indicates that Dharam estimated that the painting would extend to the entire wall to match the paint colors. (Cost Matrix at 7.)

Additionally, Mr. Weinstein when creating his cost estimate solely looked to what a contractor would charge, as in the "hard costs," and did not consider other costs which an owner

would incur such as architectural and engineering fees, expediting fees, and potential construction manager fees, all fees which Mr. Weinstein did say would be covered by an owner paying for the project. (7.1 Tr. 26:21-24 ("The contingency item is ordinarily added in by the owner to cover himself to make sure that should there be something extra that comes up on a project, he has a dollar figure there to cover himself or herself.") Mr. Weinstein might be estimating what a contractor will charge to remediate the issue such as the window shims, but the damages that will be owed to the Board must include these 'soft costs' to fully compensate the Board for the necessary repairs. (*Id.* at 74:16-76:11.)

While the Weinstein Report gives much lower cost estimates than the Dharam Report, the Weinstein Report calculates the best-case scenario costs associated solely with hiring a contractor to remediate the issue, not what the Board would otherwise expect to pay to fix the wood shims over the course of the project. As such, the Court finds the damages as estimated by the Dharam Report are more reliable than those estimated by the Weinstein Report. The Court **AWARDS** $1,198,942.68 to fix all window shims in the Building to comply with the Building Code.

7. <u>EIFS</u>

The Plaintiff seeks damages for the existence of EIFS on the façade of floors one through five, which the Offering Plan describes as being made of brick masonry and brownstone, as well as for defects in the EIFS on all floors. (Plaintiff's Proposed Findings at 17-18). In sum, the Plaintiff argues that the Sponsor violated the Offering Plan by installing EIFS on the first five floors of the Building. Further, the presence of EIFS allegedly contributed to the degradation of the brownstone, causing it to break off in layers because the EIFS prevented the brownstone from drying out after it became wet. (*Id.* at 18.)

The Plaintiff further contends that although EIFS was supposed to be installed on floors six through ten in accordance with the Offering Plan, the EIFS was supposed to be installed with a 1/8-inch-thick base coat and a 1/8-inch-thick final coat. Ms. Nussbaum observed the EIFS coating as 1/16 of an inch or less in certain areas. (*Id.* at 19.)

The Defendants claim that the EIFS is merely a "finishing over the exterior walls" and is and is supposed to be between 1/8 and 1/16 of an inch thick. (Defendants' Proposed Findings at 8-9.) The Defendants also claim that the DOB accepted a characterization of the exterior of the Building as being built with stucco, and synthetic stucco and EIFS are essentially identical. (*Id.* at 9.) The Defendants argue that the Board failed to properly maintain the EFIS, and that the Offering Plan specifically provides that the Board of Managers was responsible for the maintenance of the Building. (*Id.*) Defendants argue that any remediation efforts of EIFS do not require the total remove of the EIFS, and that the EIFS does not present a Building Code violation and there are no unsafe conditions arising from it. (*Id.*) Defendants note Ms. Nussbaum testified that the EIFS coating was Building Code-compliant at the time of its installation. (*Id.*)

Defendants also contend that any issues associated with the EIFS constitute either latent or patent defects. (*Id.* at 9-10.) The Offering Plan provides the following:

> Sponsor shall not be obligated to correct, and shall not be liable to any purchaser as a result of . . . (ii) variations from the plans and specifications or description of the Building or a Unit set forth in the Offering Plan which are neither in violation of applicable building codes, nor require approval of any governmental authority having jurisdiction, provided such variations are of substantially similar or better quality.

(Offering Plan at 52.)

The analysis with respect to the EIFS issues can be broken down into the following questions: (i) is the presence of EIFS on floors one through five a variance from the Offering Plan or a latent/patent defect, (ii) if the EIFS is a variance from the Offering Plan, is it a violation of the building code, or is it of a substantially similar or better quality, (iii) is the EIFS a patent or latent defect, (iv) was the EIFS installed improperly in a way that damaged the underlying brownstone, (v) if the EIFS was improperly installed, did the Board fail to notify the sponsor and fail to mitigate the harm from improperly instilled EIFS.

*a. EIFS is a Violation of the Offering Plan*

The Offering Plan is clear in its requirement that the first five floors of the building would be *brownstone*. (Offering Plan at 95 (stating "exterior walls are of brick masonry and 'brownstone.' The exterior walls from the sixth floor to roof are of non-bearing non-combustible construction of steel studs, cementitious boards gypsum wallboard Styrofoam with two (2) layers of 1/8" each of cement with insulation within the study cavities as required giving a minimum U factor as per the New York State Energy Conservation Code.") There is not a meaningful dispute that the existence of EIFS on the first five floors of the Building constitutes a violation of the Offering Plan.

*b. Is EIFS a Violation of the Building Code and of a Substantially Similar or Better Quality?*

Having determined that the EIFS constitutes a violation of the Offering Plan, the Court must then determine whether the Sponsor is liable or otherwise obligated to correct this violation. The Offering Plan provides that the Sponsor shall not be obligated to remediate any various defects that are (i) insubstantial variations of the Offering Plan, or (ii) variations from the Offering Plan that do not violate the building codes, require approval of a governmental authority, or such variation is of a substantially similar or better quality. (*Id.* at 52.)

Placing EIFS on the first five floors is not an insubstantial variation from the brownstone exterior provided by the Offering Plan. While Plaintiff does not provide a fulsome explanation why the EIFS is not an insubstantial variation from the Offering Plan, Plaintiff does detail how EIFS, when installed incorrectly, can damage brownstone and prevents it from drying out on its own. As such, the Court finds that the presence of EIFS on the first five floors is a substantial variation from the Offering Plan insofar as it requires substantial additional maintenance by the Board and offers a different aesthetic appearance than what was provided in the Offering Plan.

Moreover, the Plaintiff does not appear to contend that EIFS on the first five floors constitutes a violation of applicable building code provisions. However, the Plaintiff does contend that the EIFS is not of a substantially similar or better quality to brownstone. Ms. Nussbaum testified that EIFS is considered "cheap" coating that was the subject of numerous lawsuits in the 1980s and 90s. (Plaintiff's Proposed Findings at 19.)

*c. Does the EIFS on the First Five Floors Constitute a Defect?*

The Defendants contend that any issues associated with the EIFS system constitute either a patent or latent defect, and no written notice was provided to the Sponsor by the Plaintiff. (Defendants' Proposed Findings at 9-10) There appear to be two issues with respect to the EIFS: (i) installing the EIFS on the first five floors of the Building constitutes a defect and (ii) whether the EIFS was installed defectively.

The Offering Plan requires that the Board provide written notice to the Sponsor to establish liability (hereinafter the "Notice Provision"). (*See* Offering Plan at 49.) The Offering Plan specifically provides the following:

> Sponsor will cause to be corrected any latent defects (I.e., defects which are not visually ascertainable in the construction of the Building . . . but only if (a) such patent defects are due to substantially improper workmanship or material substantially and

> materially at variance with the architectural plans and specifications; and (b) (i) as to any Unit, Sponsor is notified of such defects within six (6) months after closing of title to Purchaser's Unit or (ii) as to the Common Elements, Sponsor is notified in writing by the Board of Managers of such defects within six months after the First Meeting of Unit Owners.

(*Id.*) If the Plaintiff failed to provide the Sponsor with written notice, the Notice Provision will bar its claims with respect to latent or patent defects. *See* 266 *West 115th Street Condominium v. 266 West 115th Street, LLC*, 2014 WL 6791412, at *2 (N.Y. Sup. Ct. Dec. 02, 2014) (interpreting a similar provision). While Plaintiff disputes that the Board had an obligation to provide written notice to the Sponsor regarding patent and latent defects, not only is the provision clear on the Board's requirement to do so, but the State Court had previously denied Plaintiff's interpretation that the notice requirement does not apply. *Tribeca Space Managers, Inc. v. Tribeca Mews Ltd.*, 64 Misc. 3d 1230(A) at *3-*4 (N.Y. Sup. Ct. 2019) (denying Plaintiff's motion to strike Defendant's affirmative defenses related to this clause in the Offering Plan). This decision was later affirmed on appeal: "[T]he court properly denied plaintiff's motion to dismiss the ninth and tenth affirmative defenses, which may apply to patent and latent defects that are unrelated to Sponsor's alleged failure to meet its obligations to construct the building to code in conformity with plans and specifications, and to obtain a permanent certificate of occupancy." *Tribeca Space Managers, Inc. v. Tribeca Mews Ltd.*, 200 A.D.3d 626, 627-28 (2021).

With respect to the existence of EIFS on the first five floors of the Building, it constitutes a variance from the Offering Plan but does not constitute a "defect" with respect to the Notice Provision. Determining exactly what the existence of the EIFS constitutes involves related, but distinct, concepts—deviations and defects. The Board may not recover for defects that it failed

to provide written notice of, but the Notice Provision does not apply to deviations, variances, or other applicable terminology.

Black's Law Dictionary defines "defect" as "a failing, absence, deficiency, shortcoming, failing, eclipse, diminution, [or] fading . . . ." DEFECT, BLACK'S LAW DICTIONARY (12th ed. 2024). A "deviation," on the other hand, is defined as a change from a customary or agreed-on course of action. DEVIATION, BLACK'S LAW DICTIONARY (12th ed. 2024). The mere existence of the EIFS is not an a "failing" or "deficiency" inasmuch as it is a "change from an agreed upon course of action." Accordingly, the presence of the EIFS on the first five floors of the Building does not constitute a patent or latent defect under the Notice Provision and the Notice Provision does not bar the Board from bringing a cause of action for breach of contract.

However, the EIFS also appears to be defective. Plaintiff has put forth significant evidence of the fact that the EIFS coating was improper. Ms. Nussbaum noted that the amount of EIFS coating was insufficient, that the EIFS was installed over voids, which caused the EIFS to crack, that adhesive was applied haphazardly, and other failures that led to water infiltration. (Plaintiff's Proposed Findings at 19.) These failures constitute construction defects and the Board failed to provide written notice to the Sponsor. (Defendants' Proposed Findings at 9-10.) The Board was also aware of issues related to the EIFS' construction and received a quote to repair the EIFS in 2012 of $25,000. (*Id.* at 10.)

Accordingly, the Notice Provision **BARS** the Plaintiff from damages as a result of the defective construction of the EIFS, but the Plaintiff is **NOT BARRED** from damages for the existence of the EIFS on the first five floors of the Building as it is inconsistent with the Offering Plan.

*d. Damages that the Plaintiff May Recover*

The Court **DENIES** the Plaintiff's request for compensation with respect to the repair and replacement of the EIFS on the entirety of the façade of the Building. However, the Court will award damages with respect to the EIFS on floors one through five of the Building solely for it being a violation of the Offering Plan.

The Dharam Report and Cost Matrix set the amount to replace the EIFS and restore the brownstone façade on floors 1-5 of the Building at $4,606,082.09. (Dharam Report at 7.) However, this number accounts for the cost to remediate issues with the brownstone that Plaintiff's expert stated resulted from the defective installation of the EIFS, including the replacement of eighty percent of the brownstone on the facade. (*See* 6.23 Tr. 55:6-59:1 (Ms. Nussbaum testifies that when defectively installed, EIFS will allow water to get to the brownstone underneath and cause it to break apart through "a process called exfoliation."); Cost Matrix at 7-8.) The Dharam Report does not separate out the cost to remove the EIFS from the costs to repair and replace the damaged brownstone.

Absent evidence on the cost to solely remove the EIFS from floors one through five, the Court **AWARDS** nominal damages of $10 per square foot of façade on the floors one through five covered by EIFS, which per the Dharam Report that is 10,200 square feet. (Cost Matrix at 8.) Plaintiff is awarded $102,000 for the breach of the Offering Plan.

8. Copings, Parapets, and Cornices

Under the Offering Plan, roof parapets were required to be "a minimum of three feet six inches above the roof" and the parapets and their copings were required to be constructed of "steel stud and viroc sheathing finished with two layers of stucco cement." (Offering Plan at 97). The parapet height is required by the Building Code under section 27-334 and the parapet

construction per the Offering Plan would be Building Code Complaint as it would not contain combustible material. As discussed previously, exterior walls (such as the parapet) cannot contain combustible material. Building Code § 27-374.

TT found combustible material, specifically non-fire rated plywood, in the parapets. (Nussbaum Report at 48.) In addition, TT found that when measured the parapets were under 3 feet six inches, measuring only 3 feet 3 3/4 inches. (*Id.*) The Board has already paid to remediate these issues; they raised the parapets to 42 inches for $166,261.00 and replaced the copings and deteriorated plywood substrate for $286,453.00. (Cost Matrix at 22.)

Defendants contest the Board's actions in raising the parapets. Of note, the Defendants claim that the Board raised the floor of the roof via the renovation of the roof deck area. This was admitted by Michael Cohen. (6.25 Tr. 247:1-7.) Ms. Nussbaum additionally testified (and the pictures included in her report indicate) that the measurements taken by TT were taken from the top of the wood decking, rather than the original roof floor. (6.24 Tr. 27:6-28:22; Nussbaum Report at 48.) No measurements were provided to the Court from the original floor to the top of the parapet. Given this, Plaintiff has not provided sufficient evidence that, as built, the parapets were not built a minimum of 3 feet and 6 inches above the roof.

Lastly, it is undisputed that brownstone cornices located on the sixth floor of the Building were supposed to be removed when the Building was renovated and expanded, as reflected in the Filed Drawings. (Nussbaum Report at 42, Appx. D.14.) When TT first observed the building, TT observed that the EIFS coating was peeling away, and exposed brownstone was loose in areas and at risk of falling down to the street below. (*Id*. at 42.) TT reported the condition to DOB as an unsafe condition and the Board paid $488,655.00 to remove the cornice in 2019. (Plaintiff's Proposed Findings at 18; Nussbaum Report at 44; Cost Matrix at 10.) Defendants

agree the Building was designated as unsafe by DOB due to the cornice issue and that it was ultimately removed. (Defendants' Proposed Findings at 10.)

As such, the Court **AWARDS** the Plaintiff $286,453.00 in damages for the cost incurred for replacing the parapets and copings with noncombustible materials, $488,655.00 for the cost incurred in removing the brownstone cornice and **DENIES** damages for the cost of raising the parapets.

9. Terraces

On the seventh and eleventh floor of the Building, the Sponsor advertised and sold units with adjacent outdoor space as having attached "terraces," which implies that these spaces are legally permissible outdoor balconies under the Building Code. (PTO ¶¶ 73-74; *see, e.g.*, Pinto Report Appx. A, Figure A.8 (page 137 of the Offering Plan showing unit 7A with an outdoor "terrace.")) To comply with the live load-bearing requirements of the Building Code, meaning that the floor can hold an amount of weight without risk of collapse, the terraces would need to have been built with floor framing steel joists 12 inches apart. (Pinto Report at 2). Outdoor exterior areas with lower live load-bearing capacity are classified as unoccupied roof spaces and are not meant to withstand consistent human habitation. Testimony from the Board's structural engineer expert Ms. Pinto indicated that while the Offering Plan advertised all adjoining outdoor spaces to units as "terraces," the relevant Filed Drawings specified the exterior spaces of nearly all the units as "roofs" to be built with steel joists 16 inches apart. This would result in a live load capacities of only 30 pounds per square foot, rather than 60 pounds per square foot required under the Building Code for the space to be considered a balcony or terrace. (*Id*. at 5.) Some of the units on the seventh floor were designed to be built as terraces with steel joists 12 inches apart. (*Id*.) However, when Ms. Pinto examined these units on the seventh floor, she found that

the floors were built with steel joists 16 inches apart, rather than 12 inches as designed. This means that their live load capacity was below the required 60 pounds per square foot for terraces. (Pinto Report Appx. C; 6/24 Tr. 126:8-127:13.) Ultimately, per the filed drawings and the examined units, none of the units sold with a terrace under the Offering Plan were built with a legal terrace. This is clear and obvious breach of the Offering Plan.

The Pinto Report indicates that the proposed repairs for all units would require the installation of new steel joists and steel plates to structurally reinforce the connections in the flooring and make the spaces Building Code-compliant. (Pinto Report at 9). This defect is an important safety issue with the risk of the terraces collapsing if overloaded and must be remediated. The Dharam Report estimates it would cost $2,564,941.21 to remediate the issue in line with the Pinto Report remediation. (Cost Matrix at 1). Defendants fail to provide any evidence that the terraces as built are not in violation of the Building Code and do not contest the cost estimate from the Dharam Report.

As a result, the Court finds that the terraces as built are not Building Code-compliant and therefore in breach of the Offering Plan. The Court is sufficiently satisfied with the figures as calculated in the Dharam Report and **AWARD** the Board $2,564,941.21 in damages.

## V. <u>FIDUCIARY DUTY</u>

Plaintiff alleges that Brad Thurman breached his fiduciary duty as a member of the Board by being aware of and failing to disclose the issues with the Building (discussed *supra*) to the Board while sitting on the Board. For the forgoing reasons, the Court **DENIES** Plaintiff's claim.

**A. Brad's Role**

Brad and his affiliates controlled the Board entirely until the first residential board was formed in February 2009, and Brad served on the Board continuously until September 2012. (PTO ¶¶ 80-83.)

The Sponsor Certification—which Brad signed as a principal of the Sponsor—states that he read the Offering Plan, investigated the underlying facts, undertook due diligence, and confirmed that the Offering Plan was complete, accurate, and contained no untrue statements. (Offering Plan at 266-267.) At trial however, Brad testified that he had mistakenly signed the Offering Plan. (6.24 Tr. 161:5-19.) Defendants assert that "Brad lacked construction training and experience, was not an architect or engineer, and could not ascertain whether the construction of the subject building was compliant with the Offering Plan, Building Code or plans on file with the DOB." (6.22 Tr. 92:6-13, 108:6-9; 114:7-115:3.) According to Brad, the details about who was responsible for work on the Building "died" with his father Harold Thurman. (6.24 Tr. 183:5-9.) Additionally, Brad testified that he was at the building only once or twice between 2007 and 2009. (6.25 Tr. 71:18-21.).

**B. Brad's Alleged Awareness and Concealment of Building Defects**

The Plaintiff asserts that during trial "it was established that both during and after construction, and while wearing his many hats, Brad was aware of some or all of the serious issues affecting the Condominium but failed to disclose those conditions to the Board." (Plaintiff Proposed Findings at 25.) The Plaintiff continues that, "[d]espite repeated notice from unit owners of deficiencies in the Building, in his unwavering loyalty to Sponsor and its affiliates, Brad actively concealed the existence of known deficiencies and failed to take steps to ensure that Sponsor corrected the defective conditions in the Building." (*Id.*) The Plaintiff relies

on the testimony of the building superintendent, Mr. Castillo, to claim that Brad engaged in a "scheme to deceive the DOB into approving the defective exhaust system so that the Sponsor could obtain a TCO." (*Id.*) Mr. Castillo testified that he notified Brad that the vents were not working following his inspection and testing and that Brad told him he would look into it but that the exhaust system was never fixed. (6.29 Tr. 27:11-20.) Mr. Castillo also testified that Brad instructed him to manipulate the vents during the DOB inspection so that the defective system could get DOB approval. (*Id*. at 29:16-30:13.)

The Plaintiff claims that after the TCO was obtained "through subterfuge," Brad continued his "concealment." (Plaintiff Proposed Findings at 26.) The Plaintiff notes:

> Cohen, a current unit owner and former Board President, testified that he complained to Tomas about cooking and bathroom smells shortly after he moved into the building in August 2008. (6.25 Tr. 164:9-17; 165:2-5; 165:9-25; 166:2-19; 176:23-177:13). Tomas confirmed this and testified that he personally inspected Cohen's unit and confirmed that the vents were not working. (6.29 Tr. 34:15-35:29). Tomas brought this to Brad's attention and, again, Brad said that he would have his construction supervisor, John Hlenka ("Hlenka"), investigate the problem. (*Id*. at 35:13-19). Yet again, nothing was done to remedy the problem.

(*Id*.) In December 2008, unit owner Ed Otte emailed Brad about the cooking smells permeating his unit due to "improper installation or design." (PX 36.) Brad responded to the email, saying "I will have Tomas discuss with John H. and have that looked into today." (*Id*.) Mr. Castillo testified that he did not inspect the vents in Ed Otte's unit because he knew the vents were not working as he had previously informed Brad. (6.29 Tr. 39:2-25). Mr. Castillo testified that he spoke with Brad about Mr. Otte's complaints, but that Brad did nothing to remedy the exhaust system. (*Id*. at 39:13-25).

The Plaintiff notes that despite "direct knowledge that the exhaust system was inoperable and defective from multiple sources across several years, Brad never engaged any professionals to investigate it." (Plaintiff Proposed Findings at 26.) According to Brad, only a few fans needed to be adjusted because they were not working. (6.24 Tr. 198:10-200:5; 201:19-23; PX36).

The issue of the smells was raised at two town hall meetings that Brad did not attend, and "virtually every Board meeting" after the town hall. (6.25 Tr. 167:13-20; 170:15-18; 174:22-175:15; 176:4-22.) The Plaintiff asserts that Brad never informed the Board that he knew the exhaust system was defective or that the Sponsor had circumvented DOB approval procedures to obtain the TCO. (*Id*. at 178:1-4.) The Plaintiff argues:

> At every stage, disclosure would have permitted the Board, on behalf of the unit owners, to investigate promptly, preserve evidence, pursue timely claims, mitigate damages, and potentially require corrective work before conditions deteriorated further. Instead, Brad's concealment ensured that the Sponsor could escape immediate responsibility while the unit owners unknowingly inherited a multimillion-dollar liability.

(Plaintiff Proposed Findings at 27.) The Plaintiff similarly claims that Mr. Castillo informed Brad about leaks throughout the Building when the Sponsor controlled the Board, which was until February 2009. (6.29 Tr. 41:4-42:18; PTO at 17.) Mr. Castillo also claims to have informed Brad around that same time that the façade was so fragile that it completely crumbled when he attempted to perform a high-pressure wash of the EIFS. (*Id*. at 41:3-11.) Mr. Castillo testified that Brad instructed Thurcon to engage a façade contractor to patch up the façade without permanently repairing the problem. (*Id*. at 42:24-43:6.)

Lastly, Mr. Castillo testified that he walked the hallways of the building with Brad once or twice a month from September 2007 until May 2008 before there was any carpeting, and that

it was clear that the uncarpeted hallways were constructed of plywood, not cement board as required by the Offering Plan. (*Id*. 22: 13-23:16; 23:23-24:11.)

**C. Discussion**

New York courts have established that Sponsor-appointed board members owe heightened fiduciary duties to unit owners. *Fairway at N. Hills*, 193 A.D.2d at 325 (The initial, sponsor-appointed board is "subject to a great potential for conflicts of interest, such that a very high standard of duty must be imposed upon it to ensure that its members do not gear their decisions to benefit the sponsor at the expense of the association or its members.") (internal citations omitted).

To establish the element of breach against an individual member of a condominium board, there must be an underlying tort committed by that individual member. *Bd. of Managers of Honto Condo. v. Red Apple Child Dev. Ctr.*, 160 A.D.3d 580, 582, 76 N.Y.S.3d 136 (1st Dept. 2018) (dismissing breach of fiduciary duty claim against condominium board member on summary judgment since no tortious conduct was alleged as to the individual board members); *Sunken Pond Ests. Homeowners Ass'n, Inc. v. Sunken Pond Ests., Inc.*, 2012 WL 2742825 at *5 (Sup. Ct. Suffolk Cty. 2012) (dismissing breach of fiduciary duty claim against sponsor-appointed condominium board member on summary judgment since no tortious conduct by the member was alleged).

As a Sponsor-appointed Board member, Brad Thurman had a fiduciary relationship to unit owners. However, deceit and concealment—the only wrongdoing that the Board alleges against Brad—are not actionable torts. *See, e.g.*, *Sebco Dev., Inc. v. Siegel & Reiner, LLP*, 2024 WL 1203969, at *22 (Sup. Ct. Bronx County 2024) (stating that "the allegation that defendants conveyed false information is not, by itself, tantamount to an actionable tort"). The cases cited

by Plaintiff support this. *See Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 49 (1st Dep't 2012) ("The claims that remain as against Nitze that we must address are breach of fiduciary duty (first cause of action) *insofar as it is based on allegations of defamation* . . . .") (emphasis added); *see also Berenger v. 261 W. LLC*, 93 A.D.3d 175, 185 (2012) ("Absent any allegation of independent tortious conduct, the individual [board members] cannot be held liable for breach of fiduciary duty."); *Bd. of Managers of Greenwich St. Condo. v. SGN 443 Greenwich St. Owner LLC*, 224 A.D.3d 401, 402 (2024) (the court denied a motion to dismiss a claim for "breach of fiduciary duty based on allegations of actual fraud . . . .") As such, Plaintiff has failed to show that Brad engaged in the underlying tortious activity necessary to assert a breach of his fiduciary duty.[3]

Accordingly, Plaintiff's cause of action for breach of fiduciary duty against Brad Thurman is **DIMISSED**.

## VI. FRAUDULENT CONVEYANCE

Plaintiff alleges both constructive and fraudulent conveyance claims against the defendants. As discussed below, the claims are **DENIED**.

### A. Constructive Fraudulent Conveyance

Plaintiff argues that it has established both its actual and constructive fraudulent conveyance claims. To establish a constructive fraudulent conveyance, a plaintiff must show that it was a creditor of the transferor, that the transferor made a transfer without fair consideration, and that the transfer either rendered the transferor insolvent or left it with unreasonably small capital. *Bd. of Managers of Be@William Condo. v. 90 William St. Dev. Grp.*

[3] Plaintiff had moved to amend their claim in the State Court Action to assert a fraud claim against Brad. That motion was denied and the trial court was affirmed on appeal. *Tribeca Space Managers*, 64 Misc. 3d 1230(A) at *6, *aff'd in part* 200 A.D.3d at 628.

*LLC*, 2019 WL 1170871, at *4 (Sup. Ct. N.Y. Cnty. Mar. 13, 2019), *aff'd*, 187 A.D.3d 680, 135 N.Y.S.3d 360 (1st Dep't 2020).

First, Plaintiff notes that the sale of units generated tens of millions of dollars, with the sale of 10 units alone generating approximately $13.6 million for Sponsor. (Plaintiff's Proposed Findings at 37.) Brad, being vague about where the proceeds went, testified that they were transferred to either the Sponsor of which Brad is principal, or his father Harold Thurman. (*Id.*) Plaintiff notes that Brad further testified that the proceeds were used to pay both the Sponsor's expenses and his father's expenses, which he claimed were "one and the same." (*Id.*) While Brad testified that the proceeds were used to pay outstanding invoices to the companies that had constructed the Building, Plaintiff claims that Brad and Harold Thurman nevertheless benefitted from the transaction because they owned the construction companies. (*Id.*) Plaintiff argues that the Thurman's control over the same construction companies made them corporate insiders, making the payments are presumptively fraudulent. (*Id.*) At best, Plaintiff argues that the Thurmans shifted assets from "one insider-controlled pocket to another while retaining the economic benefit and leaving Plaintiff with an empty shell." (*Id.*) (citing *American Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388 (S.D.N.Y. 2015) (holding that payments to corporate insiders owned and controlled by a debtor to satisfy antecedent debts qualify as fraudulent conveyances).

Plaintiff argues that the transfer of units from Tribeca Mews to RentCo for no consideration left Sponsor unable to complete its contractual duties under the Offering Plan and thus insolvent—Sponsor had left itself only $7,500 to acquire a PCO, which given their failings to even maintain a TCO was clearly an insufficient amount. (Plaintiff's Proposed Findings at 38.) Plaintiff claims that once it has established that the units were transferred without fair

consideration, the law presumes that the conveyance rendered the Sponsor insolvent and the burden shifts to the Defendants to establish solvency. *See La Dolce Vita Fine Dining Co. v. Lan*, 2026 WL 818579, at *5 (S.D.N.Y. Mar. 24, 2026). Plaintiff claims that Defendants did not establish that Sponsor received fair consideration for the transfer and did not demonstrate the Sponsor's solvency after the conveyance. (*Id.*)

Yet the caselaw cited by the court in *La Dolce Vita* suggests that the presumption of insolvency requires more of a showing than just a lack of fair consideration. In *RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 199 (S.D.N.Y. 2001), which is cited by *La Dolce Vita* for the presumption, the plaintiff provided financial statements to support the finding of insolvency. In *In re Corcoran*, 246 B.R. 152, 163 (E.D.N.Y. 2000), another case discussing the presumption, the court noted that it was "undisputed" that the Debtor was insolvent given the debtors debt at the time of the transfer. It is far from undisputed here that the Defendants were insolvent at the time of transfer in 2011. *See In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011) ("The operative reference point for determining insolvency is the time at which the transfer took place . . . . For purposes of New York constructive fraudulent conveyance law, insolvency is analogous to the Bankruptcy Code's definition, which requires some sort of 'balance sheet' test or information provided that the Court can use to infer that the corporation's liabilities exceeded their assets at the time the transfers took place."); *see also In re Chin*, 492 B.R. 117, 127 (E.D.N.Y. 2013) (stating that "the operative reference point for determining insolvency is the time at which the transfer took place and insolvency of the transferor cannot be presumed from subsequent insolvency at a later point in time").

Plaintiff was precluded by the State Court from seeking documents post-mistrial in 2017 relating to Defendants' financial information (*see* DX YY) due to Plaintiff's failure to seek such

information in discovery before certifying to the State Court in 2015 that all discovery was complete (DX BBB). The Court, without being provided with any sort of financial documents to prove insolvency at the time of the transfers, cannot assume that the Debtors were insolvent at the time of the alleged transfers. The Court therefore **DENIES** the constructive fraudulent conveyance claims.

**B. Actual Fraudulent Conveyance**

A cause of action for actual fraudulent conveyance under the former NY DCL, applicable to this case, required Plaintiff to adduce evidence that (1) a conveyance was made (2) with actual intent to defraud creditors. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 467 (S.D.N.Y. 2018). Intent can be shown through the badges of fraud, which include "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1999).

The transfer of six units between Tribeca Mews and RentCo fails to meet this standard as some of the badges of fraud firmly point *against* intent to defraud; not only was this transfer made clear to the Board, but it can be argued that it was in the usual course of business (as RentCo was also becoming the successor sponsor) and RentCo now had control over the units in question. As a result, the Plaintiff fails to show that the transfer of the six units was an actual fraudulent conveyance.

Regarding the Thurmans, the Plaintiff failed to supply evidence that either Brad or Harold Thurman actually received a conveyance of funds from Tribeca Mews for the sale of units. As noted above, no financial documents from either Thurman were provided during trial,

and there was no evidence showing any conveyance taking place provided. The NY DCL did not "either explicitly or implicitly, create a creditor's remedy for money damages against parties who . . . were neither transferees of the assets nor beneficiaries of the conveyance." *Fed. Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 842 (1990). "Liability cannot be imposed against a defendant for aiding and abetting a fraudulent conveyance as the alleged wrongdoer has not actually benefitted from the fraudulent conveyance." *In re Parker*, 399 B.R. 577, 581 (Bankr. E.D.N.Y. 2009).

Accordingly, the Court **DENIES** Plaintiff's claims for actual fraudulent conveyance.

## VII. CONCLUSION

The Court **AWARDS** the following damages to the Plaintiff:

- $1,072,000.00 for the Defendant's breach of the Offering Plan by failing to obtain a PCO and TCO (Section IV.A);
- $10,225,359.41 to remediate the Kitchen and Bathroom Exhaust Shafts issue (Section IV.B.1);
- $1,513,860.06 to remediate the Fire Rated Construction issue (Section IV.B.2);
- $771,175.01 to remediate the Accessibility issue (Section IV.B.4);
- $523,616.22 to remediate the Ceiling Height issue (Section IV.B.5)
- $1,335,856.35 to remediate the Combustible Material in Non-Combustible Walls issue (Section IV.B.6);
- $102,000.00 to compensate the Board for the installation of EIFS on floors one through five in breach of the Offering Plan (Section IV.B.7);
- $286,453.00 to reimburse the Board for costs incurred to remediate combustible materials found in the parapets (Section IV.B.8);

- $488,655.00 to reimburse the Board for costs incurred to remove the brownstone cornice (Section IV.B.8); and
- $2,564,941.21 to remediate the Terrace issue (Section IV.B.9).

Additionally, as Defendants are in violation of the So-Ordered Stipulation for failing to procure a PCO or remediate the exhaust shaft issue, the Court **AWARDS** to the Board attorneys' fees pending proper accounting. (*See* Order Denying Defendants' Motions in Limine, ECF Doc. # 54 at 5 (permitting the Board to claim attorneys' fees if a breach of the So-Ordered Stipulation is established.))

The Court **DENIES** damages for

- Combustible Materials in the Flooring (Section IV.B.3): while the use of the combustible materials in floors six through ten was a breach of the Offering Plan, it is no longer a violation of the Building Code. As unit owners do not need to vacate given the presence of sprinklers in the building and residing in the units is not a life safety issue, the Plaintiff has not been damaged;
- The cost of repairing and replacing EIFS (Section IV.B.7): as discussed above, while the installation of EIFS on floors one through five was a breach of the offering plan, the failure of the Board to notify the Sponsor bars damages relating to any defective construction; and
- The cost of raising the parapets to 42 inches (Section IV.B.8): measurements were taken from the decking added to the roof by the Plaintiff and do not suggest the as-built condition was in violation of the Offering Plan or Building Code.

The Court additionally **DENIES** both the Fiduciary Duty and Fraudulent Conveyance claims brought against the Defendants.

In conclusion, the Court **GRANTS** Plaintiff an allowed claim totaling $18,883,916.26, along with Plaintiff's legal fees pending proper accounting, against both Tribeca Mews and RentCo for joint and several liability.

Because I retire on September 30, 2026, the *25 My RentCo* cases will be reassigned to another judge. In light of the substantial allowed claim as determined in this Opinion (with the addition of legal fees) it is questionable whether the debtors can successfully be reorganized. Counsel shall meet and confer on the proposed approach to resolving these cases in advance of a hearing before the new judge.

**IT IS SO ORDERED.**
Dated: September 25, 2026

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge